KING, JUSTICE, DISSENTING:
 

 ¶ 204. In two previous direct appeals, this Court has reversed Flowers's conviction
 and death sentence as a result of prosecutorial misconduct. In
 
 Flowers v. State
 
 ,
 
 842 So.2d 531
 
 (Miss. 2003) (
 
 Flowers II
 
 ), the prosecution's argument of facts not in evidence resulted in reversal. Finding that a
 
 Batson
 

 [8]
 
 violation had occurred, this Court reversed and remanded
 
 Flowers v. State
 
 ,
 
 947 So.2d 910
 
 (Miss. 2007) (
 
 Flowers III
 
 ), for a new trial. Despite the same errors occurring in the trial that is the subject of this appeal, the Majority, in a stark departure from this Court's previous
 
 Flowers
 
 opinions, found that Flowers's conviction and death sentence should be affirmed. The United States Supreme Court then granted Flowers's petition for a writ of certiorari, vacated our judgment, and remanded the case (a "GVR") to this Court for further consideration. The United States Supreme Court finds that a GVR is potentially appropriate
 

 [w]here intervening developments, or recent developments that we have reason to believe the court below did not fully consider, reveal a
 
 reasonable probability
 
 that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a redetermination may determine the ultimate outcome of the litigation[.]
 

 Lawrence on Behalf of Lawrence v. Chater
 
 ,
 
 516 U.S. 163
 
 , 167,
 
 116 S.Ct. 604
 
 ,
 
 133 L.Ed.2d 545
 
 (1996) (emphasis added). To put it simply, the United States Supreme Court issued a GVR in this case because a majority of its members believed that a reasonable probability exists that this Court got it wrong on the first try. Yet, this Court ignores that strong implication and makes the same erroneous decision on remand. Because the errors in this case, particularly the denial of Flowers's
 
 Batson
 
 claims highlighted by the United States Supreme Court, resulted in Flowers being denied his right to a fair trial, I dissent.
 

 I. Prosecution's Argument of Facts Not in Evidence
 

 ¶ 205. Three instances of the prosecution arguing facts not in evidence appear in today's case: (1) the prosecution misstated the time Sam Jones discovered the victims' bodies at Tardy's; (2) the prosecution stated an unsupported basis for Flowers's alleged motive; and (3) the prosecution incorrectly described Porky Collins's reaction to the photo arrays. In
 
 Flowers II
 
 ,
 
 842 So.2d at 550
 
 , the prosecution's misstatement of facts during closing argument was one basis,
 
 inter alia
 
 , for this Court's reversal. In that appeal, Flowers cited approximately fourteen alleged misstatements.
 

 Id.
 

 at 555
 
 . This Court found that the following misstatements by the prosecutor resulted in an unfair trial: (1) that defense witnesses tried to coerce the State's witnesses to lie; (2) that Sam Jones received a call at 9:30 a.m. from Bertha Tardy asking him to come to the store; and (3) that Flowers "was mad" about losing his job and having his pay docked.
 

 Id.
 

 at 555-56
 
 .
 

 ¶ 206. The statements that resulted in this Court reversing Flowers's conviction and death sentence in
 
 Flowers II
 
 are notably similar to the statements raised in today's case. While this repetition of prosecutorial misconduct is alarming, the Majority's approval of the same is even more startling. Courts have long recognized-and reasonably feared-that misconduct during closing argument may become commonplace in our trial courts. Despite regular admonishments, such misconduct still occurs:
 

 That despite our consistent warnings to the Government we should still be called upon to admonish against such conduct
 is reprehensible per se because it constitutes a disregard for our directives. But additionally it is particularly pernicious because it results in an unnecessary waste of judicial resources, both at the trial and appellate level, by diversion and attention to review of what now should be understood to be totally unacceptable conduct by those who lay claim to representing the Government ....
 

 U.S. v. Maccini
 
 ,
 
 721 F.2d 840
 
 , 846 (1st Cir. 1983). The Majority in today's case, by endorsing the prosecutor's misstatements-the same misstatements which warranted reversal in
 
 Flowers II
 
 -takes Mississippi one step closer to having misrepresentation of the facts presented at trial commonplace in our trial courts.
 

 A. Sam Jones's Testimony Regarding His Arrival at Tardy's
 

 ¶ 207. Sam Jones died prior to Flowers's 2010 trial, and his testimony from Flowers's 2007 trial was read into evidence. Flowers claims that the State misrepresented Jones's testimony regarding the timeline of events the morning of the murders. Jones testified as follows:
 

 A. Well, [Bertha Tardy] called me and asked me-I had promised her I would come down and help them load out a truck and go on a delivery. And she called me to ask me about was I coming down there. And I told her that I was. And then about, that was about 15 minutes after 9:00, I think, when she called, somewhere along in there.
 

 Q. About what time did you get to the store that morning, Mr. Jones?
 

 ....
 

 A. I got to the store; it was before-it was right at, between 9:15 and 9:30.
 

 Q. Okay.
 

 A. I will put it like that. It wasn't 9:30.
 

 Q. Okay. You got to the store between 9:15 or right around that time?
 

 A. Yes.
 

 Although Jones testified that he arrived at Tardy's between 9:15 and 9:30 a.m., the State attempted to question Jones later about the timeline and misstated that he arrived closer to 10:00 a.m.:
 

 Q. Okay. And I think-I might have misled you a little bit. It was, when you got to the store, that was going to be closer on up to 10 o'clock, wasn't it?
 

 Flowers's Counsel: Object to leading, Your Honor.
 

 Court: Overruled.
 

 Jones never responded to this question.
 

 ¶ 208. In its closing argument, the State discussed the timeline for the morning of the murders and apparently put the timeline on some type of marker board. During the timeline discussion, the prosecution stated: "Mr. Sam Jones came into the store slightly after 10:00 on the morning of the 16th and discovered the bodies." Flowers did not object to this statement at closing argument.
 

 ¶ 209. In
 
 Flowers II
 
 ,
 
 842 So.2d at 511
 
 , this Court addressed whether this same issue was procedurally barred by lack of contemporaneous objection. This Court applied plain error to the issue, and found that the prosecution's misstatements warranted reversal.
 

 Id.
 

 "The plain error doctrine requires that there be an error and that the error must have resulted in a manifest miscarriage of justice."
 
 Williams v. State
 
 ,
 
 794 So.2d 181
 
 , 187 (Miss. 2001) (citing
 
 Gray v. State
 
 ,
 
 549 So.2d 1316
 
 , 1321 (Miss. 1989) ),
 
 overruled on other grounds by
 

 Foster v. State
 
 ,
 
 148 So.3d 1012
 
 (Miss. 2014).
 

 ¶ 210. In
 
 Flowers II
 
 ,
 
 842 So.2d at 555
 
 , the prosecution stated that Sam Jones had testified that Bertha Tardy had called him
 at 9:30 a.m. Reviewing this statement, this Court stated:
 

 After a thorough examination of the record, it is clear from Jones's testimony that he testified he arrived at Tardy's at 9:30. He never once stated he was called at 9:30 on the morning of July 16, but he did testify he arrived at the store around 9:30. On direct examination, the State never questioned Jones about a specific time. He only stated he received a call from Mrs. Tardy on the morning of July 16. On cross-examination, Jones was asked what time he arrived at Tardy's, and he answered it was around 9:30.
 

 Id.
 

 at 556
 
 . This Court then found that "[t]he cumulative effect of the State's repeated instances of arguing facts not in evidence was to deny Flowers his right to a fair trial."
 

 Id.
 

 ¶ 211. Flowers claims that the statement in today's case prejudiced him by essentially skewing the timeline in the State's favor. Porky Collins and Clemmie Flemming both testified that they saw Flowers near Tardy's around 10:00 a.m. Flowers claims that if Jones's testimony had been accurately described-that he arrived at the store between 9:15 and 9:30-the question of what Flowers was doing so close to the scene of a murder thirty to forty-five minutes after the murders could have occurred would have been raised in the jurors' minds.
 

 ¶ 212. There is no doubt that the prosecutor's statement is not supported by Sam Jones's testimony and that there is no direct evidence supporting the contention that Jones arrived at Tardy's at 10:00 a.m. The prosecution's statement is not based on facts and prejudiced Flowers by deliberately painting an incorrect picture for the jury of the events surrounding the discovery of the murders-this same picture was painted in
 
 Flowers II
 
 .
 

 B. Flowers's Motive
 

 ¶ 213. The second misstatement Flowers cites relates to his alleged motive to commit the murders. Similar to Sam Jones's testimony and the timeline described above, misstatements related to Flowers's motive were another basis for this Court's reversal in
 
 Flowers II
 
 ,
 
 842 So.2d at 556
 
 . In
 
 Flowers II
 
 ,
 
 842 So.2d at 555-56
 
 , this Court found that the prosecution's statement that Flowers "was mad" as a result of losing his employment with Tardy's was a misstatement of the facts:
 

 [T]he prosecutor argued to the jury that [Robert] Campbell had testified that Flowers was mad because Mrs. Tardy had terminated his employment and was holding money out of his paycheck to cover the damaged batteries. Defense counsel objected on the basis that the prosecutor was mischaracterizing Campbell's testimony, and when the prosecutor responded that he was quoting verbatim from his notes, the trial court overruled the defense objection. ... After a thorough examination of Campbell's testimony, it is clear Campbell never testified Flowers was upset at Mrs. Tardy. The State never questioned Campbell about Flowers's feelings toward Tardy or about any money. On redirect, Campbell was asked if Flowers ever mentioned anything was wrong with Mrs. Tardy, and Campbell stated Flowers never mentioned anything to him.
 

 Id.
 

 ¶ 214. In today's appeal, Flowers claims that the following statement by the prosecutor was not based on facts in evidence:
 

 The investigators learned pretty quickly when they asked who in the world could have had some reason, some motive, some anything to attack four people like this.
 

 Have you had anybody that's had beef with the store? Just one.
 
 Well, that doesn't mean he did this though, does it? No. But you check that out. You look at him. And in the course of deciding what, if anything, Curtis Flowers had to do with this crime.
 

 Flowers claims that no evidence was presented at trial supporting the contention that he was angry as a result of his termination. In response, the State argues that the following supports the contention that Flowers "had beef" with Tardy's:
 

 1. Flowers losing his job days prior to the murders.
 

 2. Bertha Tardy deducting the cost of damaged inventory from Flowers's paycheck.
 

 3. Police Chief John Johnson's testimony that the Tardy family considered Flowers a threat:
 

 Q. Okay. How did Curtis Flowers become a suspect by then, by 6:30?
 

 A. I knew that the Tardy family had considered Curtis a threat and that they were concerned about their safety dealing with him.
 

 4. Investigator Jack Matthew's testimony about employees who had been fired from Tardy's:
 

 Q. You asked who else had worked there the last couple of years and those kind of things?
 

 A. Well, we asked if there was anybody that they'd had any problem with or anybody that had been fired from there, and that was the-Curtis was the only one.
 

 5. Doyle Simpson's testimony that Flowers had "problems" with Tardy's:
 

 Q. Okay. Did you know anything about Curtis having any problems with Tardy Furniture.
 

 A. I had heard about it.
 

 ¶ 215. This evidence cited by the State supports the contention that Tardy's employees were concerned about Flowers. But the feelings and perceptions of Tardy's employees must be distinguished from Flowers's perception. The statements cited by the State do not establish that Flowers had ill will toward Tardy's employees. Further, Doyle Simpson's testimony is too vague to support a statement that Flowers "had beef" with the store. "Problems" could easily refer to the firing itself or the damaged inventory. The State's contention that Flowers "had beef" with Tardy's is unsupported by the facts. As this Court recognized in
 
 FlowersII
 
 , this factually unsupported statement resulted in Flowers having an unfair trial.
 

 C. Porky Collins's Response to Photo Arrays
 

 ¶ 216. Next, Flowers claims that the prosecutor misrepresented Porky Collins's response to the first photo array-the array that contained a photograph of Doyle Simpson. Flowers claims that this misrepresentation was particularly prejudicial because part of his defense was based on the alternative theory that Doyle Simpson was the perpetrator. Collins saw two African-American men arguing outside Tardy's the morning of the murders. When Collins testified, he stated that he did not remember if he identified Simpson as one of the men standing outside Tardy's. The notes taken during the photo arrays state that Collins had the following reaction to the array containing Simpson's photo:
 

 # 1 and # 3 resembles, but hairline was further back
 

 # 6 pointed to Simpson, said hairline like this, may have appeared a little darker.
 

 "But it looks like him."
 

 "Face was also same shape, round like this."
 

 "Unable to be positive."
 

 Investigator Wayne Miller testified that Collins did point out Simpson during the photo array:
 

 Q. All right. So he did actually point out Mr. Simpson here as somebody who was-looks like the person he'd seen; is that a fair characterization?
 

 A. Right.
 

 ¶ 217. The State presented the following closing argument related to Collins's identifications:
 

 When Porky found out that some people had been murdered in front of Tardy's, he told James Taylor Williams. He said I saw something I think y'all ought to know about. He said I think I can identify that guy if I see him again. Now, here's the interesting thing about Mr. Porky Collins. Porky didn't know Curtis. Never claims to have ever seen him before. Didn't know him. Didn't know those other people, as far as them having seen him. Porky says I can identify him.
 

 I'm going to refer to this some more in a minute but I just want you to-you've seen these. We had them passed to y'all. Here are two line-ups. These line-ups were shown to Porky at the same setting. First was this one that has Doyle Simpson's picture on it. Because later on when they did this line-up, they already knew that the gun came out of Doyle's car. And so they gave this thing to Porky first and said is the guy that you saw in front of Tardy's in this group.
 

 Now, if he was going to make a misidentification, ladies and gentlemen, that would have been the perfect time for him to pick one of these guys and say yeah, there he is right there. But you know what? Porky did not misidentify anybody.
 
 He said the guy ain't there.
 
 They took another six photographs and said look at this second set. He said that's him right there. You heard Mr. Miller talk about Porky, said he was positive. He made a positive identification.
 

 Now, why is Porky's i.d.-Porky doesn't know him. Porky wasn't able to say yeah, I know him. When he saw the photograph of Curtis Flowers, he pointed him out. So you have got two different kinds of identifications and they agree. You've got identification by all these witnesses who knew him, Porky, who didn't know him, and they both agree. And he was offered-Porky was offered a prime chance to mess up. The perfect chance to make a mistake. He almost-it didn't develop out that way it, but it was almost like a trick.
 

 You know, see if he is in there. No, he is not.
 
 Is he in the second group? Yeah. That's him right there. So that's a pretty strong identification, isn't it?
 

 ¶ 218. While the State correctly characterized Collins's identification of Flowers in the second photo array, the State deliberately failed to recognize Collins's statement that Simpson's photograph in the first array "looks like" a man he saw outside of Tardy's and that he was "unable to be positive." The State's argument that Collins stated "the guy ain't there" was not an accurate representation of Collins's identification. Because Flowers's defense was based, in part, on the argument that Doyle Simpson was a likely suspect for the murders, the State's misstatement regarding Collins's identification of Simpson prejudiced Flowers.
 

 ¶ 219. As in
 
 Flowers II
 
 , the prosecution's repeated argument of facts not in evidence in today's case prejudiced Flowers and denied him his right to a fair trial. Under this Court's heightened review of death penalty cases, these misstatements-standing alone-should be enough
 to warrant reversal.
 
 See
 

 Fulgham v. State
 
 ,
 
 46 So.3d 315
 
 , 322 (Miss. 2010) ("What may be harmless error in a case with less at stake becomes reversible error when the penalty is death."). This Court's prior admonishment of essentially the same statements in
 
 Flowers II
 
 bolsters a finding of reversal.
 
 See
 

 U.S. v. Drummond
 
 ,
 
 481 F.2d 62
 
 , 62 (2d Cir. 1973) ("Because of the repeated misbehavior of this prosecutor in this and prior cases, we feel compelled to reverse the decision of the trial court on the sole ground of prosecutorial misconduct.").
 

 II. Jury Selection Process
 

 ¶ 220. Flowers claims that the State violated the Equal Protection Clause of the Fourteenth Amendment when it struck five African-American jurors after utilizing disparate questioning and citing pretextual reasons. "The Constitution forbids striking even a single prospective juror for a discriminatory purpose."
 
 Foster v. Chatman
 
 , --- U.S. ----,
 
 136 S.Ct. 1737
 
 , 1747,
 
 195 L.Ed.2d 1
 
 (2016) (internal quotations omitted). Because a review of the record in today's case reveals that a
 
 Batson
 
 violation did occur, I dissent.
 

 ¶ 221. "It is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full protection which others enjoy."
 
 Strauder v. West Virginia
 
 ,
 
 100 U.S. 303
 
 , 309,
 
 25 L.Ed. 664
 
 (1880),
 
 abrogated on other grounds by
 

 Taylor v. Louisiana
 
 ,
 
 419 U.S. 522
 
 ,
 
 95 S.Ct. 692
 
 ,
 
 42 L.Ed.2d 690
 
 (1975). Racial prejudice in the prosecution's jury selection results in "state-sponsored group stereotypes rooted in, and reflective of, historical prejudice."
 
 J.E.B. v. Alabama ex rel T.B.
 
 ,
 
 511 U.S. 127
 
 , 128,
 
 114 S.Ct. 1419
 
 ,
 
 128 L.Ed.2d 89
 
 (1994). Thus, for years, courts have held that racial discrimination by the State during the jury selection process violated the Equal Protection Clause.
 
 Miller-El v. Dretke
 
 ,
 
 545 U.S. 231
 
 ,
 
 125 S.Ct. 2317
 
 ,
 
 162 L.Ed.2d 196
 
 (2005) (quoting
 
 Georgia v. McCollum
 
 ,
 
 505 U.S. 42
 
 , 44,
 
 112 S.Ct. 2348
 
 ,
 
 120 L.Ed.2d 33
 
 (1992) ).
 

 ¶ 222. In an effort to remedy the prejudices existing in jury selections, the United States Supreme Court has, over the years, developed various standards for establishing purposeful discrimination. In
 
 Swain v. Alabama
 
 ,
 
 380 U.S. 202
 
 ,
 
 85 S.Ct. 824
 
 ,
 
 13 L.Ed.2d 759
 
 (1965),
 
 overruled by
 

 Batson v. Kentucky
 
 ,
 
 476 U.S. 79
 
 ,
 
 106 S.Ct. 1712
 
 ,
 
 90 L.Ed.2d 69
 
 (1986), the Court attempted to regulate purposeful discrimination through presuming the legitimacy of prosecutors' strikes except in the case of longstanding patterns of discrimination-when in case after case no African Americans served on juries, then "giving even the widest leeway to the operation of irrational but trial-related suspicions and antagonisms, it would appear that the purposes of the peremptory challenge [were] being perverted."
 

 ¶ 223.
 
 Swain
 
 's approach did little to remedy the problem of purposeful discrimination in jury selection. Thus, in
 
 Batson
 
 , the United States Supreme Court "held that a defendant could make out a prima facie case of discriminatory jury selection by 'the totality of the relevant facts' about a prosecutor's conduct during the defendant's own trial."
 
 Miller-El
 
 ,
 
 545 U.S. at 239
 
 ,
 
 125 S.Ct. 2317
 
 (quoting
 
 Batson
 
 ,
 
 476 U.S. at 94
 
 ,
 
 106 S.Ct. 1712
 
 ). The State must then come forward with race neutral bases for the peremptory strikes.
 
 Batson
 
 ,
 
 476 U.S. at 97
 
 ,
 
 106 S.Ct. 1712
 
 . "The trial court then has the duty to determine if the defendant has established purposeful discrimination."
 

 Id.
 

 at 98
 
 ,
 
 106 S.Ct. 1712
 
 .
 

 ¶ 224.
 
 Batson
 
 , however, is not without flaws. Thus, in
 
 Miller-El
 
 , the United
 States Supreme Court refocused on all of the relevant circumstances of the case, rather than just the proffered race-neutral bases provided by the State:
 

 Although the move from
 
 Swain
 
 to
 
 Batson
 
 left a defendant free to challenge the prosecution without having to cast
 
 Swain
 
 's wide net, the net was not entirely consigned to history, for
 
 Batson
 
 's individualized focus came with a weakness of its own owing to its very emphasis on the particular reasons a prosecutor might give. If any facially neutral reason sufficed to answer a
 
 Batson
 
 challenge, then
 
 Batson
 
 would not amount to much more than
 
 Swain
 
 . Some stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand. Hence
 
 Batson
 
 's explanation that a defendant may rely on "all relevant circumstances" to raise an inference of purposeful discrimination.
 

 Miller-El
 
 ,
 
 545 U.S. at 239-40
 
 ,
 
 125 S.Ct. 2317
 
 (citing
 
 Batson
 
 ,
 
 476 U.S. at 96-97
 
 ,
 
 106 S.Ct. 1712
 
 ).
 

 ¶ 225. Thus, in finding that a
 
 Batson
 
 violation occurred in today's case, I consider all of the relevant circumstances in Flowers's case.
 

 A. History of Flowers's Case
 

 ¶ 226. In
 
 Flowers III
 
 , 947 So.2d at 935, this Court found as "strong a prima facie case of racial discrimination as we have ever seen in the context of a
 
 Batson
 
 challenge." In
 
 Flowers III
 
 , the State exercised all twelve of its peremptory strikes on African Americans and all three of its strikes of alternate jurors on African Americans. After reviewing the individual strikes in the case, this Court found that the State engaged in purposeful discrimination during jury selection.
 
 Id.
 
 at 939. Thus, the Court reversed and remanded for a new trial on this basis.
 
 Id.
 
 The same prosecutor who this Court found had engaged in purposeful discrimination in
 
 Flowers III
 
 prosecuted the trial before this Court on appeal today. On its own, this fact is not dispositive of a finding of racial discrimination. This history, however, cannot be ignored and is part of the relevant circumstances that must be considered in this case.
 

 ¶ 227. In
 
 Miller-El
 
 ,
 
 545 U.S. at 253
 
 ,
 
 125 S.Ct. 2317
 
 , the United States Supreme Court considered the "widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude black venire members from juries at the time [the defendant's] jury was selected." If the history of discrimination by a district attorney's office is a permissible consideration under
 
 Batson
 
 , surely the history of the
 
 same prosecutor in the retrial of the same case
 
 is a legitimate consideration. To fail to consider this history is to rebuff
 
 Batson
 
 's direction that "all relevant circumstances" must be considered.
 
 Batson
 
 ,
 
 476 U.S. at 96-97
 
 ,
 
 106 S.Ct. 1712
 
 ;
 
 Miller-El
 
 ,
 
 545 U.S. at 239-40
 
 ,
 
 125 S.Ct. 2317
 
 .
 

 B. Disparate Treatment-The Numbers
 

 ¶ 228. Like the history of today's case, a review of the statistics relating to the prosecutor's use of peremptory strikes is not, standing alone, dispositive of the
 
 Batson
 
 inquiry. These numbers, however, reveal a clear pattern of disparate treatment between white and African-American venire members. In today's case, a special venire of 600 citizens was drawn. The original venire consisted of forty-two percent African Americans. After the jury qualification and initial for-cause challenges, the venire consisted of twenty-eight percent African Americans. Ultimately, one African American
 served as a juror and one African American served as an alternate juror. Despite the initial venire consisting of forty-two percent African Americans, the jury that convicted and sentenced Flowers consisted of eight percent African Americans.
 

 ¶ 229. An analysis of the number and type of questions asked by the prosecutor further reveals a pattern of disparate treatment. During individual voir dire, the prosecutor asked white jurors an average of approximately three questions. African-American jurors, however, were asked approximately ten questions each by the prosecutor.
 

 ¶ 230. Further, in what appears to be mere lip service to the voir dire process, when questioning most white jurors during individual voir dire, the prosecutor essentially repeated questions that the trial court had just asked. The trial court asked each juror standard death-penalty-qualification questions. The prosecutor would then-in substance-ask the same questions and then hand the juror off to be questioned by the defense. The prosecutor asked only nine percent of white jurors something beyond these duplicated questions.
 

 ¶ 231. In a stark contrast, the prosecution asked sixty-three percent of African Americans questions outside the standard death-penalty-qualification questions. As an example, fifty-five percent of African-American jurors who had some kind of connection to the Flowers family (through work, the community, or family) were asked questions by the prosecutor about this connection. Although five white jurors had similar connections to the Flowers family (through work and the community), the prosecutor failed to ask any questions about these connections.
 

 ¶ 232. As noted in
 
 Miller-El v. Cockrell
 
 ,
 
 537 U.S. 322
 
 ,
 
 123 S.Ct. 1029
 
 ,
 
 154 L.Ed.2d 931
 
 (2003), statistical analysis can raise a question as to whether race influenced the jury selection process. The numbers described above are too disparate to be explained away or categorized as mere happenstance.
 

 C. Individual Jurors
 

 ¶ 233. The pattern of disparate treatment is further revealed when comparing the treatment of individual jurors.
 
 See
 

 Flowers III
 
 , 947 So.2d at 921 (citing
 
 Manning
 
 ,
 
 765 So.2d at
 
 519 ) (A side-by-side comparison of jurors is helpful to determine whether purposeful discrimination existed.). Explanations by the prosecution are difficult to credit where the State accepted white jurors with the same traits it used to strike black jurors.
 
 Foster
 
 , 136 S.Ct. at 1750.
 

 1. Carolyn Wright
 

 ¶ 234. The State exercised one of its peremptory strikes on Carolyn Wright for the following reasons: (1) she knew several of the defense witnesses; (2) she was sued by Tardy's for an overdue account; and (3) she used to work with Flowers's father, Archie Flowers, Sr. During the
 
 Batson
 
 hearing, Flowers rebutted the State's bases for its peremptory strike first by noting that Pamela Chesteen, Harold Waller, and Bobby Lester all had a significant number of acquaintances involved in the case. Flowers responded to the fact that Tardy's had sued Wright by noting that the State had not questioned white jurors regarding their accounts at Tardy's. Finally, Flowers rebutted the basis relating to Wright's working relationship with Flowers's family by comparing Wright to Chesteen, who was a bank teller at a bank where the members of the Flowers family were customers.
 

 ¶ 235. Finding that the State's reasons for striking Wright were race-neutral, the trial court specifically noted that all jurors
 were asked by the court during group voir dire if they had accounts with Tardy's and whether they had been sued by Tardy's. The court found that this basis was race neutral because none of the white venire members reported that they had been sued by Tardy's. The trial court found that Wright's working relationship with Archie Flowers was distinguishable from the professional relationship Chesteen had with the Flowers family. Specifically, the court stated that the Winona Walmart was a "relatively small" Walmart and seemed to imply that Wright had a close relationship with Archie Flowers because of the small size of the store. The trial court also stated that no white jurors had reported working at Walmart with Archie Flowers. The trial court summed up its finding by stating:
 

 If the only reason the State offered was that she knows some of these defense witnesses, then there might be something there. But the fact is knowing these defense witnesses that you're intending to call, plus the fact that Tardy's had to sue her, plus the fact that she worked with Archie, in my mind, creates race-neutral reasons for striking her.
 

 Each of the State's reasons for the peremptory strike is analyzed below.
 

 Wright's Relationships with Persons Involved in the Case
 

 ¶ 236. In sum, Carolyn Wright had some type of connection to thirty-four people involved in Flowers's case. Flowers compares Wright to Chesteen, who knew thirty-one people involved in Flowers's case; Waller, who knew eighteen people involved in the case; and Lester, who knew twenty-seven people involved in the case.
 

 ¶ 237. Similar to Wright, Chesteen, Waller, and Lester all had a significant number of relationships with witnesses and persons involved with the case. One indicium of pretext this Court considers is "the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge."
 
 Flowers III
 
 , 947 So.2d at 917 (quoting
 
 Manning
 
 ,
 
 765 So.2d at
 
 519 ). Indeed, " '[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination.' "
 
 Foster
 
 , 136 S.Ct. at 1754 (quoting
 
 Miller-El
 
 ,
 
 545 U.S. at 241
 
 ,
 
 125 S.Ct. 2317
 
 ). As such, this basis is suspect.
 

 ¶ 238. Flowers also claims that the State mischaracterized Wright's relationships with Flowers's family. Specifically, Flowers points out that the State claimed that Wright knew Flowers's sister, Sherita Baskin. Wright, however, never indicated that she knew Baskin. The State does not address this in its brief. This one statement could have simply been a slip of the tongue. However, "lack of support in the record for the reason given for a peremptory strike has been identified as an indicator of pretext."
 
 Flowers III
 
 , 947 So.2d at 924 (citing
 
 Manning
 
 ,
 
 765 So.2d at
 
 519 ).
 
 Foster
 
 emphasized this notion, noting that the prosecutor's "misrepresentations of the record" constituted evidence that a strike was motivated in substantial part by discriminatory intent.
 
 Foster
 
 , 136 S.Ct. at 1754.
 

 Wright's Litigation with Tardy's
 

 ¶ 239. Flowers claims that the State mischaracterized Wright's litigation with Tardy's by claiming that her wages had been garnished as a result of the litigation. Nothing in the record supports the contention that Wright's wages were garnished. The only statements Wright made regarding the actual litigation were that she was sued, but that "it was paid off." Wright also stated that her involvement with the litigation would not affect her if she were selected as a juror. During the
 
 Batson
 
 hearing, the State produced a copy of the judgment in Wright's case, and Flowers's counsel asked if a garnishment order was attached. The trial court did not directly respond to this question, but instead stated that "it's an abstract of justice court where she was sued." Because there is no evidence that Wright's wages were garnished, the State did mischaracterize its basis for the peremptory strike. Further, unlike the misstatement discussed above relating to Wright's acquaintance with Sherita Baskin, the statement that Wright had her wages garnished seems to go directly to reasoning for the State's strike-that Wright would have some sort of ill will toward Tardy's as a result of her wages being garnished. It is easy to imagine that litigation which ends in friendly terms-for example, a settlement-might result in the parties having different feelings toward one another as opposed to a suit which results in garnished wages. As such, the State's unsupported characterization of the lawsuit is problematic.
 
 See
 

 Flowers III
 
 , 947 So.2d at 924 (citing
 
 Manning
 
 ,
 
 765 So.2d at
 
 519 );
 
 Foster
 
 , 136 S.Ct. at 1754.
 

 Wright's Working Relationship with Archie Flowers, Sr.
 

 ¶ 240. Wright worked with Flowers's father, Archie Flowers, Sr., at Walmart; and on its face, this basis seems to be race-neutral.
 
 See
 

 Manning
 
 ,
 
 735 So.2d at 340
 
 (This Court "has condoned a peremptory challenge against a juror who was acquainted with the defendant's family."). However, a review of the record reveals that this basis may have been pretextual. Although the State cited Wright's working relationship with Archie Flowers as a basis for its strike, the State made no effort during voir dire to question Wright about the working relationship beyond a general question as to whether the relationship would affect her ability to serve as a juror. One could easily assume that the two worked in different departments and during different shifts. Further, Wright stated during group voir dire that she was unaware of whether Archie Flowers still worked at Walmart or if he had retired. This supports an inference that Wright and Flowers did not have a close working relationship. The lack of questioning related to this basis is suspect.
 
 See
 

 Miller-El
 
 ,
 
 125 S.Ct. at 2328
 
 (failing to conduct meaningful voir dire on subject with which State is allegedly concerned suggests that "explanation is a sham and a pretext for discrimination").
 

 ¶ 241. The questionable nature of the State's reason is compounded by its failure to strike Pamela Chesteen. Chesteen worked at a local bank in Winona and stated that she knew Archie Flowers, Sr., Lola Flowers, and Flowers's sisters from her work at the bank. Although the coworker relationship and bank-employee/customer relationship are not exactly comparable, the concern relating to the influence such relationships would have on a juror are the same-a concern that the coworker or employee would be influenced toward a family member of another coworker or a customer. The disparate treatment of Wright and Chesteen, along with the failure to conduct meaningful voir dire regarding Wright's working relationship with Archie, Sr., suggests this basis for the State's peremptory strike was pretext.
 
 See
 

 Flowers III
 
 , 947 So.2d at 924 ("Failure to voir dire as to the characteristic cited for the strike is also an indicator of pretext.").
 

 ¶ 242. When the State's bases and the record in today's case are viewed
 
 in toto
 
 , evidence of disparate treatment and pretext exists.
 
 See
 

 id.
 
 at 937 ("Though a reason proffered by the State is facially neutral, trial judges should not blindly accept any and every reason put forth by the State, especially where, as here, the State continues to exercise challenge after challenge
 only upon members of a particular race.").
 

 2. Dianne Copper
 

 ¶ 243. The State provided the following reasons for striking Dianne Copper : (1) she worked with Archie Flowers and Cora Flowers, Flowers's sister; (2) she knew several members of the Flowers family; (3) she stated that she "leaned towards" Flowers's side of the case; and (4) she knew several defense witnesses. For the most part, the State focused on Copper's statement that she would lean toward Flowers as a result of her relationships with the Flowers family.
 

 ¶ 244. Flowers rebutted the State's reasons by again noting that several white jurors with multiple connections to persons involved in the case had not been challenged by the State. Flowers also argued that the State did not attempt to rehabilitate Copper when she stated that she would lean toward Flowers's side of the case. The trial court accepted the State's reasons as race neutral, finding that Copper's relationships with persons connected to the case were distinguishable from those of the white jurors not challenged by the State. The trial court also found that Copper was distinguishable from other jurors because she stated that she would tend to favor Flowers's side of the case and had worked with Flowers's father and sister.
 

 Copper's Relationships with Persons Connected to the Case
 

 ¶ 245. Similar to his argument relating to Carolyn Wright, Flowers claims that the State's strike of Copper was pretextual because white jurors who knew several defense witnesses were not struck. Further, Flowers claims that the State mischaracterized Copper's statements relating to whether she "leaned towards" Flowers in the case as a result of her relationship with the Flowers's family.
 

 ¶ 246. Copper knew thirty-one people involved in the case. Copper also testified about her relationship with the Flowers family and witnesses during voir dire:
 

 Q. Now, I noticed that you told us the other day that you lived on Harper Street at one time?
 

 A. Yes, sir.
 

 Q. That y'all [Copper and the Flowers family] lived on the same street.
 

 A. Not on the same street. Because they-they live on Cade Street, and I lived on Harper Street.
 

 Q. Don't they live on the corner of Cade and Harper?
 

 A. Well, I guess. I'm not-I-you know, my street is Harper and then its-as it go around-that's where I assume it was Cade Street. I'm not positive.
 

 Q. Okay. And you've stated that you worked with the defendant's sister at Shoe World?
 

 A. That's correct.
 

 Q. And which sister was that?
 

 A. Cora.
 

 Q. How long did y'all work together?
 

 A. Probably a year or two.
 

 Q. Okay. You worked with the defendant's father?
 

 A. Yes, sir.
 

 Q. How long did you work with him?
 

 A. Estimating, probably-possibly about the same, one to two years.
 

 Q. Okay. And I want to make sure my notes are right, because we can all write down things wrong. You stated that you knew his father Archie Flowers.
 

 A. Yes, sir.
 

 Q. You know his brother, Archie, Jr.?
 

 A. Yes, sir. I know his brother.
 

 Q. You know his mother Lola?
 

 A. Yes, sir, I do.
 

 Q. You know witnesses in this case, Hazel Jones?
 

 A. Yes, sir, I know her.
 

 Q. You know Kittery Jones, a witness in this case?
 

 A. Yes, sir, I know him.
 

 Q. And you know Danny Joe Lott, a witness in this case?
 

 A. Yes, sir.
 

 Q. And I think it was yesterday and my notes show that you said that the fact that you know all of these people could affect you and you think it could make you lean toward him because of your connection to all of these people. Is that correct?
 

 A. It-it's possible.
 

 Q. Okay. That would be something that would be entering into your mind if you were on the jury, wouldn't it?
 

 A. Yes, sir.
 

 Q. And it would make it to where you couldn't come in here and, just with an open mind, decide the case, would it?
 

 A. Correct.
 

 ¶ 247. Flowers's counsel attempted to rehabilitate Copper :
 

 Q. ... What I'm trying to find out is just as you could put aside all the information you heard before about this case, could you not also put aside the fact-if you got picked as a juror, put aside the fact that you have met Mr. Flowers, that you know some other people in these cases and be fair to the Tardys, the Stewarts, the Goldens, and Rigbys, and make whatever decision or vote that you're going to make based on the evidence and the evidence only. Could you do that?
 

 A. I feel like I could. But, you know, it-
 

 Q. Is what you're saying-
 

 A. Of course, it would make me, you know, feel uncomfortable. But if I had to do it, you know, I got to do what I got to do.
 

 Q. Okay. So you're saying that-thank you. You're saying that you'll be uncomfortable. You'd prefer not to-I get the impression you're saying that you'd rather not be a juror. But if you got picked to be one, you would take the responsibility seriously, and you would follow the law and the rules that the Court give[s] you, and you would put aside anything that you are required to put aside and make your evidence and make your vote based on just the evidence you hear in the courtroom. Is that fair to say?
 

 A. Yes, sir. That's correct.
 

 ¶ 248. As mentioned above, one indicium of pretext is "the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge."
 
 Id.
 
 at 917 (quoting
 
 Manning
 
 ,
 
 765 So.2d at
 
 519 ). As such, the State's basis that Copper knew several witnesses in the case is suspect. While the other bases the State provided appear to be race neutral-namely, Copper's relationship with Flowers's family and the possibility that it could cause her to "lean toward" Flowers, the unchallenged jurors with a shared characteristic must still be considered.
 

 3. Flancie Jones
 

 ¶ 249. The State provided the following reasons for striking Jones: (1) she is related to Flowers; (2) she was late for jury selection on two separate occasions; and (3) she provided inconsistent statements on her view of the death penalty by lying on her juror questionnaire in an attempt to avoid serving as a juror. After reviewing the record, the State's bases for striking Jones appear to be race-neutral.
 

 4. Tashia Cunningham
 

 ¶ 250. The State cited Cunningham's working relationship with Flowers's sister and her wavering statements on the death penalty as bases for its peremptory strike. During the
 
 Batson
 
 hearing, Flowers's counsel rebutted the State's reasons by pointing out that Cunningham stated that she could set aside her relationship with Flowers's sister and be a neutral juror. Defense counsel also compared Cunningham to Chesteen, the juror who knew several of Flowers's family members from working at a local bank. Finally, Flowers's counsel compared Cunningham's alleged wavering views on the death penalty to views of white jurors. The trial court found that both of the State's reasons were race-neutral:
 

 And Ms. Cunningham's all-over-the-map response to the death penalty, plus her situation about working so closely with Mr. Flowers's sister, in my mind, the State has shown race-neutral reasons for that strike.
 

 Cunningham's Working Relationship with Flowers's Sister
 

 ¶ 251. During voir dire, Cunningham stated that she and Sherita Baskin, Flowers's sister, did not have a close relationship; Cunningham described it as a "working relationship." According to Cunningham, she and Baskin would "sometime" see each other, but would not see each other at work every day. Cunningham also stated that she worked at the end of the assembly line, and Baskin worked at the front of the line. The two women worked the same shift for two or three years.
 

 ¶ 252. Apparently, the State called Cunningham's employer, ADP, to confirm her testimony relating to her working relationship with Baskin. During individual voir dire, the State asked Cunningham further questions about the relationship:
 

 Q: And you work with the Defendant's sister, Sherita Baskin?
 

 A: Yes.
 

 Q: Now, the other day, I think you said that you do not work close to her?
 

 A: No, I do not.
 

 Q: Would you think about that for a minute?
 

 A: I do not.
 

 Q: Are you sure that you do not work side by side with her?
 

 A: No, I do not.
 

 Q: And you're saying that under oath?
 

 A: Yes, sir.
 

 ¶ 253. In response to Cunningham's statements, the State called an ADP quality control clerk, Crystal Carpenter, to give testimony. Carpenter testified that Cunningham and Baskin both worked on the "raw 2 line" and that the women worked side-by-side-"nine or ten inches" apart from one another. Twenty-five to thirty-five persons worked on this particular assembly line. Carpenter also testified that the women would occasionally not work side-by-side if another employee was absent from work and a spot in another location needed to be filled, but that the women typically worked next to one another. Carpenter observed the women working every day and based her testimony on her personal observations. Flowers's counsel asked Carpenter if there was documentation supporting the location of Cunningham and Basking on the assembly line, and Carpenter stated that she could provide documentation supporting her testimony. Apparently, Carpenter did not provide the documentation.
 

 ¶ 254. At first glance, the conflicting testimony of Cunningham and Carpenter tends to provide a race-neutral basis for the State's challenge.
 
 See
 

 Manning
 
 ,
 
 735 So.2d at 340
 
 . When considering the voir dire process as a whole, however, the State's investigation of Cunningham is suspect. As discussed above, the State accepted Pamela Chesteen as a juror even though she stated that several members of the Flowers family were customers at the bank where she worked. There is no evidence in the record that the State further investigated the relationship between Chesteen and the Flowers family, and the State did not voir dire Chesteen on this subject. The absence of voir dire and investigation for Chesteen compared to the thorough investigation for Cunningham is problematic and tends to evidence disparate treatment.
 
 See
 

 Miller-El
 
 ,
 
 125 S.Ct. at 2328
 
 (failing to conduct meaningful voir dire on subject with which State is allegedly concerned suggests that "explanation is a sham and a pretext for discrimination");
 
 see also
 

 Flowers III
 
 , 947 So.2d at 924 ("Failure to voir dire as to the characteristic cited for the strike is also an indicator of pretext.").
 

 Cunningham's Wavering Views on the Death Penalty
 

 ¶ 255. The State cited Cunningham's wavering views on the death penalty as another basis for its challenge. On her juror questionnaire, although she stated that she had "no opinion" on the death penalty, Cunningham stated that she would not consider the death penalty under any circumstances. During voir dire by the trial court, Cunningham initially stated that she could not consider the death penalty as a punishment, but she then stated that she "might" consider it:
 

 Q: ... [w]hat's your view on even considering the death penalty?
 

 A: I would not.
 

 ...
 

 Q: Are-are you saying you would not consider it?
 

 A: No, sir.
 

 Q: Even if the law allowed it and the facts justified it, you just could not even consider it?
 

 A: No, sir.
 

 ...
 

 Q: So-but again, just tell me again what your feelings are on the death penalty.
 

 A: I don't believe in the death penalty.
 

 Q: And would there be a possible-could you consider it?
 

 A: I don't think so.
 

 Q: You don't think so?
 

 A: I don't think so.
 

 Q: But there's-in your own mind, you might could-are you saying you could possibly?
 

 A: I don't think so.
 

 Q: See, I'm not asking you to make a-you know, you haven't heard anything. And all we want to know is whether you could consider that as a possibility-that as a sentencing possibility, because you and your fellow jurors will decide the sentence, but I just want to know if you could even consider that as a possible sentence?
 

 A: I might. I might. I don't know. I might.
 

 Q: So you might be able to consider that?
 

 A: (Nodding head).
 
 [9]
 

 Then during voir dire by the State, Cunningham returned to her initial position of not being able to consider the death penalty:
 

 Q: All right. As far as the death penalty-and I want to make sure I understand what you're saying-if the law authorized the death penalty in this case and you found that the facts of the case that came from the stand justified it, could you, in fact, vote for the death penalty?
 

 A: I don't think so.
 

 ...
 

 Q: Could you consider the death penalty yourself if the facts justified it and the law allowed it?
 

 A: I don't think so.
 

 Q: You don't think so.
 

 A: That I could.
 

 When questioned by defense counsel, Cunningham then stated that she could consider both punishments:
 

 Q: ... And what you're required to do is just consider both, then decide which way you want to vote. Do you understand now?
 

 A: Yes, sir.
 

 Q: And that's your decision. And with that being the case, can you consider both options, then vote your conscience?
 

 A: Yes.
 

 ¶ 256. This Court has recognized that a juror's views on the death penalty may provide a race-neutral basis for a peremptory challenge.
 
 See
 

 Batiste v. State
 
 ,
 
 121 So.3d 808
 
 , 848 (Miss. 2013) ;
 
 Flowers III
 
 , 947 So.2d at 920-21. In
 
 Flowers III
 
 , this Court found that the striking of an African American who had "virtually indistinguishable" views on the death penalty as compared to white jurors who were not struck raised an inference of discrimination, although, standing alone, it did not warrant the finding of a
 
 Batson
 
 violation.
 
 Flowers III
 
 , 947 So.2d at 921. In today's case, there are no white jurors who survived for-cause challenges whose views on the death penalty were comparable to Cunningham's. As such, it cannot be said that this basis was pretext.
 

 ¶ 257. This race-neutral basis, however, does not erase the prosecutor's highly suspect investigation of Cunningham's working relationship with Flowers's sister.
 
 Batson
 
 ,
 
 476 U.S. at 96-97
 
 ,
 
 106 S.Ct. 1712
 
 ;
 
 Miller-El
 
 ,
 
 545 U.S. at 239-40
 
 ,
 
 125 S.Ct. 2317
 
 . No evidence in the record provides a basis for the in-depth investigation. Likewise, nothing in the record evidences that a similar investigation was performed for all other jurors. With this suspect record, the prosecution's unusual investigation of Cunningham must be seen for what it is worth-a questionable search for a race neutral basis, indicating that striking Cunningham was "motivated in substantial part by discriminatory intent."
 
 See
 

 Foster
 
 , 136 S.Ct. at 1754 (internal quotations omitted).
 

 5. Edith Burnside
 

 ¶ 258. The State provided the following reasons in support of its peremptory strike of Burnside: (1) she knew Flowers and members of his family; (2) she was sued by Tardy's Furniture; and (3) she provided inconsistent statements regarding her views on the death penalty.
 

 Burnside's Litigation with Tardy's
 

 ¶ 259. During voir dire, the trial court asked the entire venire if anyone had been sued by Tardy's, and Burnside responded that she had been sued by the store. Later, Burnside explained that she was able to pay off the amount that she owed the store and that the litigation stemmed from a misunderstanding about her account after the murders occurred. During the
 
 Batson
 
 hearing, the State represented that Burnside had a garnishment issued against her. The prosecutor stated: "She also was sued by Tardy Furniture, and a garnishment was issued against her. She tried to
 deny that and said that she just settled with them when she came back but she was, in fact, sued by them." The State's description of the litigation and Burnside's testimony regarding the same is not completely supported by the record. In response to the trial court's first inquiry during group voir dire, Burnside stated: "I had an account there, but I was not sued by Ms. Bertha. It was later on when it was took over by Mr. Frank and Roxanne." Burnside then confirmed that she was sued by Tardy's.
 

 ¶ 260. Then, during individual voir dire, Burnside further explained the suit:
 

 A: .... Let me explain that. I worked for Ms. Bertha. She hired me to work for Mr. Tardy before she was married to him the first time. I was caring for Ms. Lena Tardy. That's how I met Ms. Bertha. So when me and my husband was going through a divorce, she let me have some furniture. And she said she was going to note it on the book. Sometimes, I cleaned up for her and I paid for it and we just have, like, a little understanding about it. Okay. When she got killed, it was still on the book. And then her son-in-law-when I came back from Nevada, then that's when I had to pay for it. I don't remember when it was.
 

 Q: So there was a dispute between you and her son-in-law?
 

 A: No. It wasn't a dispute. He just-
 

 Q: Well, did you agree that you owed it?
 

 A: Yes. We had no falling out about it. I had the funds, and I agreed I owed it. When I went to Nevada, I guess it was just a space where I owed him. When I came back here and went to work, I paid him for it. We never had a misunderstanding about it.
 

 Q: If it wasn't no misunderstanding, why did it have to go to court?
 

 A: I'm not quite sure about that. I remember them bringing the papers after I come back here to go to work. Maybe he found out I was back or what. But then I went down to the store-that's when they had moved the store over to where the other building was-and I talked to him about when I paid it. We never had a falling out about it.
 

 Q: But you did have to be sued over it?
 

 A: Yes. I can't remember the-
 

 Q: And there was a judgment against you?
 

 A: Yes. But it was no falling-out about it.
 

 Q: Is there anything about that, that would cause you any difficulty in that case?
 

 A: No. Because he is a distributor for something for one of our salesman at Super Value where I work, and he come in every Thursday, and the lady make an order so I see him like on a weekly basis. But, you know, sometimes, I speak if it's-because she see him like over in her office, so no, it's nothing about that would make me have no-.
 

 ¶ 261. Similar to the State's characterization of Wright's litigation with Tardy's discussed above, the State's representation that Burnside's wages were garnished and that Burnside "denied" this is unsupported by the record in today's case. This incorrect description of the litigation between Burnside and Tardy's is suspect.
 
 See
 

 Flowers III
 
 , 947 So.2d at 924 (citing
 
 Manning
 
 ,
 
 765 So.2d at
 
 519 ) ("Lack of support in the record for the reason given for a peremptory strike has been identified as an indicator of pretext.");
 
 Foster
 
 , 136 S.Ct. at 1754 (misrepresentations of the record are evidence of discriminatory intent).
 

 Burnside's Relationships with Flowers and His Family
 

 ¶ 262. The State also cited Burnside's relationships with Flowers and his family as a basis for its challenge. Burnside stated during voir dire that she used to live close to the Flowers family. Flowers and his sister, Prisilla, used to visit Burnside's home. Further, Flowers was friends with Burnside's sons and used to play football with them. Burnside stated that these relationships would not affect her ability to serve as a juror.
 

 ¶ 263. No white venire members had comparable-or even close to comparable-relationships with Flowers and his family. This Court has recognized that a juror's relationships with the defendant's family may provide a race-neutral reason for a peremptory challenge.
 
 See
 

 Manning
 
 ,
 
 735 So.2d at 340
 
 . And although Burnside stated that her connections to the Flowers family would not affect her when serving as a juror, this basis-standing alone-seems to not be pretext. As mentioned above, however, this race neutral basis does not negate the questionable characterization of Burnside's litigation with Tardy's.
 
 Batson
 
 ,
 
 476 U.S. at 96-97
 
 ,
 
 106 S.Ct. 1712
 
 ;
 
 Miller-El
 
 ,
 
 545 U.S. at 239-40
 
 ,
 
 125 S.Ct. 2317
 
 .
 

 Burnside's Statements Regarding the Death Penalty and Her Ability to Judge Others
 

 ¶ 264. The State's final reasons for striking Burnside were her statements relating to whether she could judge another person and impose the death penalty. Burnside testified as follows during individual voir dire:
 

 Q: .... And so I want to know if the facts justified it and the law allowed it, could you consider the death penalty as a sentencing possibility?
 

 A: That I don't think I could do. I don't know if I could do that. ... I don't-I don't know if I could consider it, sending anybody to death. I don't know if I could do that.
 

 Q: And can you explain further your views on that?
 

 A: I've just never been put in that predicament. I've always just don't know if I could do that. It's just the best way I can explain it. I just don't think I could do that.
 

 Q: Again, let me explain. You're not committing to do it or not to do it. You're just-we just need to know if that's something that would be in your mind where you could think about it and you could consider the possibility of it.
 

 A: I could think about it and consider it. That's all I could say.
 

 Q: And would you consider the imposition of the death penalty, if you were on the jury and it got to the second phase?
 

 A: If I was on there, yeah, I guess I'd have to.
 

 Q: So if the facts justified it and the law allowed it, you would consider it?
 

 A: Yes.
 

 Q: Also, if he did not receive that death sentence-if he was convicted and the jury did not impose the death sentence, ... [he] would receive the sentence of life without parole. So is that a sentencing option that you could consider, also?
 

 A: Yes, I could consider that.
 

 Q: And so you would consider and have an open mind as to both sentencing options then; is that correct?
 

 A: Yes, sir.
 

 Although Burnside eventually stated that she would consider both sentencing options, she later stated in voir dire that her
 reservations about judging another person would affect her ability to serve as a juror:
 

 Q: When I was asking the questions the other day about jurors that could judge other people, you stated at that time that you could not judge anyone. Why did you state that?
 

 A: Well, because I-you know, I prefer not to judge anyone. But then when they come back and say could I be fair. My thing is I prefer not to judge anyone. But no, I will be fair.
 

 Q: All right. Who will you be fair to?
 

 A: I will be fair to whoever evidence is presented. I will be fair. Because I would want somebody to be fair to me or my children or my family. That the only way I can explain it.
 

 ...
 

 Q: So you have changed your mind, and you say now that you could judge someone; is that correct?
 

 A: Well, basically, I haven't changed my mind. I just prefer not to be in a predicament where I have to judge somebody.
 

 Q: So you still have a problem with judging someone?
 

 A: I still have a problem with that.
 

 Q: Would that problem be such that you would think about it if you were picked on a jury?
 

 A: Well, I'd have to say yes.
 

 Q: It would? So that might affect your judgment in the case; is that right?
 

 A: It could, possibly, yes, sir.
 

 Flowers's counsel then rehabilitated Burnside:
 

 Q: Ms. Burnside, if you got picked on the jury, you would be fair to both sides, wouldn't you?
 

 A: Yes, sir.
 

 Q: And despite the fact that you don't like to judge, if you got picked you would, in fact, judge and be fair to both sides; is that correct?
 

 A: Yes, sir, that is correct.
 

 ¶ 265. While a juror's views on the death penalty and hesitation about serving as a juror are race neutral reasons for peremptory challenges, the State rehabilitated Burnside and she ultimately stated that she could consider either punishment and could be fair to either side.
 
 See
 

 Batiste
 
 ,
 
 121 So.3d at
 
 848 ;
 
 Hughes
 
 ,
 
 90 So.3d at
 
 626 ;
 
 Flowers III
 
 , 947 So.2d at 920-21. As such, this basis is somewhat suspect.
 

 D. Jury Selection Conclusion
 

 ¶ 266. While the Court has focused on the interests of Flowers in having a jury not tainted by racial bias, it has ignored the right of prospective jurors not to be subjected to racial bias. Beyond question, the right to a jury selection process free from the taint of racial discrimination belongs both to the parties and to the prospective jurors.
 
 See
 

 Powers v. Ohio
 
 ,
 
 499 U.S. 400
 
 , 416,
 
 111 S.Ct. 1364
 
 ,
 
 113 L.Ed.2d 411
 
 (1991) (Courts are "under an affirmative duty to enforce the ... policies embodied in [the] prohibition" on the discrimination in the selection of jurors.). When the trial court and this Court, in robotic fashion, merely say that the prosecution gave facially race-neutral reasons, which were not rebutted by the defense, both completely disregard the constitutional right of prospective jurors to be free from a racially discriminatory selection process.
 

 ¶ 267. No attorneys are present in the courtroom to protect the constitutional rights of perspective jurors. Thus, of necessity, that responsibility must be undertaken by the trial courts. The honest exercise of that responsibility demands that the trial court look beyond the mere recitation of the words "race neutral." In this case, the trial court completely ignored and failed in that responsibility.
 

 III.
 
 Batson
 
 Conclusion
 

 ¶ 268. As noted previously, this case has been twice reversed by this Court for some of the same issues presented to the Court today. In the retrial of a case under these circumstances, where the same issues are confronted, the trial court is obligated to look beyond the surface. The United States Supreme Court's decision in
 
 Foster
 
 affirms this principle. The trial court failed in that obligation.
 

 ¶ 269. Because of that failure, I cannot conclude that Flowers received a fair trial, nor can I conclude that prospective jurors were not subjected to impermissible discrimination. For these reasons, I would reverse and remand for a new trial.
 

 IV. Additional Errors
 

 ¶ 270. While the United State Supreme Court focused its remand on the
 
 Batson
 
 violation, and while I find the
 
 Batson
 
 violation dispositive, I continue to believe that other errors occurred at trial that also warrant reversal. Those errors were memorialized in Presiding Justice Dickinson's dissent in the original appeal on this matter.
 
 Flowers v. State
 
 ,
 
 158 So.3d 1009
 
 , 1076-83 (Miss. 2014) (Dickinson, P.J., dissenting). The circuit judge erred by refusing to allow the accused to defend the charges by calling a qualified expert to provide perfectly admissible expert opinions, and by instructing the jury on an aggravating factor for which the State provided no evidence. I reiterate those errors here, with credit to then-Justice Dickinson.
 
 See
 
 id.
 

 (Dickinson, P.J., dissenting).
 

 A. Dr. Neuschatz should have been allowed to testify.
 

 ¶ 271. The trial judge categorically prohibited Flowers's expert, Dr. Jeffrey Neuschatz, from providing expert testimony on eyewitness identification. It was not that the trial judge disagreed with the evidence in Dr. Neuschatz's expert affidavit-he ignored it. The trial judge felt that any helpful information that could have been provided by the expert could just as easily have been developed through cross-examination. But the information the expert would have provided could never be developed on cross examination, because the witnesses would not know they had made misidentifications.
 

 ¶ 272. This Court reviews a trial court's ruling on the admissibility of evidence under a deferential abuse of discretion standard.
 
 Miss. Transp. Comm'n v. McLemore
 
 ,
 
 863 So.2d 31
 
 , 34 (Miss. 2003) (internal citations omitted). Under Rule 702, an expert's testimony must satisfy a two-part test.
 

 Id.
 

 at 35
 
 . "First, the witness must be qualified by virtue of his or her knowledge, skill, experience[,] or education. Second, the witness's scientific, technical[,] or other specialized knowledge must assist the trier of fact in understanding or deciding a fact in issue."
 

 Id.
 

 ¶ 273. The trial judge is to act as a gatekeeper and may look to "a non-exhaustive, illustrative list of reliability factors for determining the admissibility of expert witness testimony."
 

 Id.
 

 at 36
 
 (internal citations omitted). The five factors referenced in
 
 Daubert
 

 [10]
 
 look at whether: (1) the theory or technique can be and has been tested; (2) the theory has been subjected to peer review and publication; (3) there is a high known or potential rate of error; (4) there are standards controlling the technique's operation; and (5) the theory or technique enjoys general acceptance
 within a relevant scientific community.
 

 Id.
 

 (internal citations omitted). The presence or absence of any one of these factors is not dispositive.
 

 ¶ 274. The issue of allowing experts to testify about the reliability of eyewitness identification is not new. A majority of state jurisdictions allow eyewitness identification experts to testify, provided they are properly qualified and their opinions satisfy reliability concerns, such as those set forth in
 
 Daubert
 
 . For instance, the Tennessee Supreme Court-evaluating factors similar to those mentioned in
 
 Daubert
 
 -reversed its prior position seven years ago and now allows properly qualified eyewitness experts to testify, finding that such testimony can be helpful in the jury's evaluation of an eyewitness's identification.
 
 State v. Copeland
 
 ,
 
 226 S.W.3d 287
 
 , 302-304 (Tenn. 2007). And the vast majority of states and the District of Columbia either give trial courts discretion to allow eyewitness identification expert testimony, or require the admission of such testimony.
 
 [11]
 

 ¶ 275. In this case, the trial judge first found that the trier of fact did not need
 Dr. Neuschatz's testimony. He stated: "Given the extensive cross-examination of Mr. Collins and because all other witnesses knew Mr. Flowers on sight, I do not believe an expert on witnesses identification would assist the jury in the least bit in this case." This conclusion was demonstrably incorrect. The trial judge provided no analysis of how cross-examination of the witnesses could develop the opinions provided by Dr. Neuschatz, or how the witnesses themselves could provide expert testimony. The eyewitnesses certainly could provide the facts, such as distance, lighting, length of time, etc. But Dr. Neuschatz was not presented to testify to the facts alone. His role was to begin with the facts provided by the eyewitnesses, and then provide expert testimony as to the difficulties and reliability associated with identification. The eyewitnesses themselves certainly could not provide the testimony expected from Dr. Neuschatz.
 

 ¶ 276. Nor could cross-examination provide an adequate substitute for Dr. Neuschatz's testimony. A skillful attorney may utilize cross-examination to expose contradictions in a witness's testimony. But no attorney-of even the greatest skill-can cross-examine a witness in such a way as to expose that the witness did not see what the witness actually believes he saw. And that is exactly the purpose of expert eyewitness identification testimony. Dr. Neuschatz-if allowed to testify-would have explained scientific principles affecting the accuracy of a witness's perception of what he saw.
 

 ¶ 277. The trial judge's entire
 
 Daubert
 
 analysis was as follows:
 

 Further, though, I think aside from the fact that I do not think this would assist the trier of fact, I do not think all the
 
 Daubert
 
 principles have been shown to the Court to apply to this testimony. The defense has not offered to this Court this idea that the theories the defense would testify to or the area of expertise proffered are generally accepted. I do not know whether the testimony has a potential or known high rate of error. I do not have anything about that. I do not know anything about the principles and methods used to come to conclusions. And basically, the witness did not apply the principles and methods to the facts of this case. He made broad generalizations in the document that was submitted, but he did not specifically apply those principles and methods to the facts of this case. So for all these reasons, I do not think that this witness testimony would be appropriate, and I am going to deny the testimony of this witness.
 

 The following is a detailed analysis of each sentence of the trial judge's
 
 Daubert
 
 analysis, and it demonstrates that the trial judge abused his discretion in refusing to allow Dr. Neuschatz to testify as an expert.
 

 "I do not think all the
 
 Daubert
 
 principles have been shown to the Court to apply to this testimony."
 

 ¶ 278. This statement suggests the trial court erroneously believed the defendant had a burden to show that "all the
 
 Daubert
 
 factors" applied. Clearly, this is not the case.
 

 "The defense has not offered to this Court this idea that the theories the defense would testify to or the area of expertise proffered are generally accepted."
 

 ¶ 279. This conclusion was incorrect. Dr. Neuschatz cited thirty-three studies in his affidavit, each of which indicated general acceptance in the field of psychology. The State offered no evidence in rebuttal of Dr.
 Neuschatz's affidavit on this point.
 
 [12]
 

 ¶ 280. The majority's only reason for agreeing with the trial judge on this point is that Dr. Neuschatz did not attach each article to his affidavit. But under our Rules of Evidence, experts are not required to attach the basis of their opinions to their affidavits. Instead, they are allowed to rely on studies that they do not provide to the court, unless requested by the court. Rule 705 provides
 

 The expert may testify in terms of opinion or inferences and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.
 

 Miss. R. Evid. 705.
 

 ¶ 281. In this case, neither the trial judge nor the State requested production of the underlying data or the articles upon which Dr. Neuschatz relied. It was clear error for the trial judge to reject Dr. Neuschatz's affidavit merely because the articles were not attached. And the majority compounds the error by requiring the expert in this case to do something other experts are not required to do,
 
 [13]
 
 and something this very Court's rules specifically do not require.
 

 ¶ 282. In
 
 Watts v. Radiator Specialty Company
 
 , this Court considered whether an expert's opinions were actually supported by the case-studies he cited.
 
 Watts v. Radiator Specialty Co.
 
 ,
 
 990 So.2d 143
 
 , 146-48 (Miss. 2008). The expert in that case did not provide the studies to the court.
 

 Id.
 

 at 147 n.7. Though this Court found that the trial court properly excluded the expert's testimony because the studies did not support his conclusion, the Court never questioned his failure to provide those studies.
 

 Id.
 

 "I do not know whether the testimony has a potential or known high rate of error. I do not have anything about that."
 

 ¶ 283. Again, on this point, the trial judge was incorrect. In his affidavit, Dr. Neuschatz discussed extensive testing that produced precise error rates. For instance, in discussing the factor of exposure time, Dr. Neuschatz stated:
 

 Exposure duration had a significant impact on identification accuracy. Ninety-five percent of the young adults and 85% of the older adults made correct identifications from the robber-present photo arrays when the robber was exposed for 45 seconds, but only 29% of the young adults and 35% of the older adults made correct identifications when the robber was exposed for 12 seconds.
 

 ¶ 284. In discussing the appearance change disguise factor, he stated: "The average performance levels across the six studies, which involved over 1,300 eyewitness identifications, was 57% correct when uncovered and versus 44% when a hat was worn."
 

 ¶ 285. In discussing cross-race identification, Dr. Neuschatz stated:
 

 The reliability of the ORB [own-race bias] was examined by Meissner and Brigham (2001) who meta-analyzed the results of 31 separate studies involving 91 separate experimental tests of own versus same-race identifications. The studies included over 5,000 participants. Across all studies, eyewitnesses were 1.4 times more likely to correctly identify members of their own race than members of other races, and they were 1.56 times more likely to falsely identify members of other races than members of their own race.
 

 ¶ 286. These and other studies cited in the affidavit speak not only to error rates but also to the reliability of Dr. Neuschatz's opinions.
 

 "I do not know anything about the principles and methods used to come to conclusions."
 

 ¶ 287. Here again, the trial judge was incorrect. The studies cited above, and the balance of Dr. Neuschatz's affidavit are replete with descriptions of the methods and principles used in the numerous studies.
 

 ¶ 288. Dr. Neuschatz's affidavit contained detailed information about studies on: (1) how memory works; (2) effect of exposure time on reliability of memory; (3) effect of appearance changes and disguises on identification; (4) the phenomenon of unconscious transference where one situation is confused with another; (5) problems with cross-racial identifications; (6) problems with post identification feedback; and (7) problems with suggestive line-up procedures.
 

 "And basically, the witness did not apply the principles and methods to the facts of this case. He made broad generalizations in the document that was submitted, but he did not specifically apply those principles and methods to the facts of this case."
 

 ¶ 289. Again, the trial judge was incorrect. Dr. Neuschatz indeed applied the principles and methods in his field of expertise to the facts in the Flowers case. For instance, he analyzed in detail the effect of the police's line-up identification. Also, he addressed issues involving Porky Collins's identification, including problems with cross-racial identifications.
 

 Refusing to allow Dr. Neuschatz to testify was not harmless error.
 

 ¶ 290. Dr. Neuschatz's testimony would have provided the jury a fair basis upon which to judge the accuracy of Collins's identification. I also cannot accept the majority's conclusion that "Collins's identification was far from the only evidence of guilt in the instant case, and it cannot be label 'critical.' "
 

 ¶ 291. It is true that the State had other witnesses, but none provided the powerful eyewitness testimony that Collins provided. He is the only witness who placed Flowers at the scene of the murders shortly before they were committed. None of the witnesses was more critical to the State's case, and none was more important for the defense to attack.
 

 ¶ 292. The State offered
 
 nothing
 
 in rebuttal of Dr. Neuschatz's opinions: no experts, articles, studies, or evidence of any kind that tended to refute his opinions and methodology. Accordingly, Dr. Neuschatz should have been allowed to testify in this case.
 

 B. The trial judge should have denied the State's requested instruction on the commission of a capital crime to avoid arrest aggravator.
 

 ¶ 293. When Flowers's case proceeded to the sentencing phase, the trial judge instructed the jury to consider three potential aggravating factors:
 

 1. The Defendant knowingly created a great risk of death to many persons.
 

 2. The capital offense was committed while the Defendant was engaged in the commission of the crime of armed robbery for pecuniary gain.
 

 3. The capital offense was committed for the purpose of avoiding or preventing lawful arrest or effecting an escape from custody.
 

 The jury found each aggravating factor and sentenced Flowers to death. Because the trial judge erred when he instructed the jury to consider the third aggravating factor, I would reverse Flowers's death sentence and remand for resentencing even if this Court affirmed his conviction.
 

 ¶ 294. It is elementary that the State bears the burden to prove the defendant's guilt of a charged offense beyond a reasonable doubt.
 
 Henley v. State
 
 ,
 
 136 So.3d 413
 
 , 415-16 (Miss. 2014). Likewise, our law places upon the State the burden in a capital murder sentencing proceeding to prove the existence of
 
 each aggravating factor beyond a reasonable doubt
 
 .
 
 Holland v. State
 
 ,
 
 587 So.2d 848
 
 , 874 (Miss. 1991) (citing
 
 Nixon v. State
 
 ,
 
 533 So.2d 1078
 
 , 1099 (Miss. 1987),
 
 overruled on other grounds by
 

 Wharton v. State
 
 ,
 
 734 So.2d 985
 
 , 991 (Miss. 1998) );
 
 see also
 

 Keller v. State
 
 ,
 
 138 So.3d 817
 
 , 867-68 (Miss. 2014). Only when the State satisfies its burden may the jury weigh a particular aggravating factor in favor of a death sentence.
 
 Keller
 
 ,
 
 138 So.3d at 867-68
 
 .
 

 ¶ 295. The Majority relies on this Court's repeated statement that an instruction should be granted on this aggravating factor if the jury may draw an inference from the evidence that avoiding arrest was "a substantial reason for the killing."
 

 Id.
 

 at 868
 
 (quoting
 
 Gillett v. State
 
 ,
 
 56 So.3d 469
 
 , 505-06 (Miss. 2010) (quoting
 
 Leatherwood v. State
 
 ,
 
 435 So.2d 645
 
 , 651 (Miss. 1983) ));
 
 see also
 

 Wiley v. State
 
 ,
 
 750 So.2d 1193
 
 , 1206 (Miss. 1999) ;
 
 Woodward v. State
 
 ,
 
 726 So.2d 524
 
 , 540 (Miss. 1997) ;
 
 Foster v. State
 
 ,
 
 687 So.2d 1124
 
 , 1140 (Miss. 1996) ;
 
 Taylor v. State
 
 ,
 
 672 So.2d 1246
 
 , 1275 (Miss. 1996) ;
 
 Walker v. State
 
 ,
 
 671 So.2d 581
 
 , 611 (Miss. 1995) ;
 
 Carr v. State
 
 ,
 
 655 So.2d 824
 
 , 853-54 (Miss. 1995) ;
 
 Chase v. State
 
 ,
 
 645 So.2d 829
 
 , 858 (Miss. 1994) ;
 
 Hansen v. State
 
 ,
 
 592 So.2d 114
 
 , 153 (Miss. 1991) ;
 
 Lanier v. State
 
 ,
 
 533 So.2d 473
 
 , 490 (Miss. 1988). But that standard-stated in that way with nothing more-cannot be the law. Saying jurors may draw an inference is not enough, unless the inference is so strong that, standing alone, the inference is sufficient for a finding beyond a reasonable doubt. The inference in this case clearly does not fall into that category.
 

 ¶ 296. The Majority says a reasonable juror could infer that Flowers killed one of the victims to prevent identification and avoid arrest. While a reasonable juror might very well find that to be a possibility, it would be no more than a guess. And no reasonable juror could make that finding beyond a reasonable doubt. Judges should submit issues to juries through instructions
 
 only
 
 when a reasonable juror could find the beyond a reasonable doubt burden of proof satisfied on that issue.
 
 Henley
 
 ,
 
 136 So.3d at 415-16
 
 (quoting
 
 Edwards v. State
 
 ,
 
 469 So.2d 68
 
 , 70 (Miss. 1985) (citing
 
 May v. State
 
 ,
 
 460 So.2d 778
 
 , 781 (Miss. 1984) ) (a directed verdict should be granted if no reasonable juror could find the defendant guilty beyond a reasonable
 doubt));
 
 Harper v. State
 
 ,
 
 478 So.2d 1017
 
 , 1021 (Miss. 1985) (a lesser offense instruction should be granted unless no reasonable juror could find that the defendant committed the lesser offense).
 

 ¶ 297. Stated another way, jurors certainly are free to draw reasonable inferences from the facts. But a juror's ability to draw a reasonable inference is not the same as a reasonable juror's ability to find that fact beyond a reasonable doubt. For instance, one may draw a reasonable inference that a person who usually goes to lunch from 12:00 to 1:00 p.m. is at lunch on a particular day at 12:30 p.m. But that does not mean one may reach that conclusion beyond a reasonable doubt.
 

 ¶ 298. So a trial judge should grant a State's request to instruct the jury on this aggravating factor only where the State has presented evidence from which a reasonable juror could find beyond a reasonable doubt that "a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities."
 
 Keller
 
 ,
 
 138 So.3d at 867-68
 
 (quoting
 
 Gillett
 
 ,
 
 56 So.3d at 505-06
 
 (quoting
 
 Leatherwood
 
 ,
 
 435 So.2d at
 
 651 )). And any case that categorically establishes inferences as sufficient to satisfy the beyond-a-reasonable-doubt standard should be overruled.
 

 ¶ 299. The State presented insufficient evidence to meet its burden. The most that may be said in this case is that the jury could speculate that Flowers committed one of the murders to avoid arrest. There was no evidence that he did. In fact, the State argued in the guilt phase that Flowers committed the murders for different purposes: revenge and anger over being fired as well as to effectuate the robbery. From its opening statement, the State's theory of the case was that Flowers possessed a motive to commit the murders because he had been fired by Tardy's. This motive-a revenge killing-is at odds with a conclusion that he killed out of a necessity to avoid arrest. No evidence was presented that Flowers expressed an intent to kill to avoid arrest.
 

 ¶ 300. The Majority finds that this aggravating factor instruction is supported by two facts: Flowers knew his victims and Flowers disposed of evidence after the killings. The second can be disposed of easily because it bears no logical connection to the question at hand. Regardless of the reason someone commits murder, that person usually has an incentive to dispose of the evidence. Said differently, if Flowers killed his victims out of pure anger, he would have an incentive to cover up the killing by disposing of evidence. The same could be said if Flowers killed because the victims resisted the robbery. Showing that Flowers disposed of evidence after the killing makes it no more reasonable to conclude that he killed to avoid arrest.
 

 ¶ 301. Likewise, the Majority's reliance on the fact that Flowers knew his victims is misplaced. First, by the Majority's own statement, this rationale applies to one victim. The majority states:
 

 The State's theory was that Flowers intended to kill Bertha Tardy because she fired him and withheld his pay and, in the process of doing so, he shot and killed the others. Flowers knew Carmen Rigby from working at the store, but there is no evidence that he knew Robert Johnson or Derrick Stewart, as the day of the murders was their first day to work at the store.
 

 This statement acknowledges that Flowers killed Tardy-not to avoid arrest-but for revenge. The Majority admits that Flowers did not know Johnson or Stewart. So at best, the Majority's reliance on this evidence relates to Rigby alone. But even there it cannot provide sufficient evidence
 to grant the instruction. It is simply inaccurate to say that a reasonable juror could conclude beyond a reasonable doubt that Flowers killed Rigby to avoid arrest, simply because they had worked together.
 

 ¶ 302. True, this Court has supported an instruction on this aggravating factor in the past based solely on the fact that the victim knew the defendant and could identify him.
 
 Wiley
 
 ,
 
 750 So.2d at 1206
 
 . But if we are to enforce the burden of proof required of the State, this was error. Allowing a jury to consider an aggravating factor based on nothing more than pure speculation cannot reach the level of proof beyond a reasonable doubt. Because the State presented insufficient evidence from which a reasonable juror could find this aggravating factor beyond a reasonable doubt, I would reverse Flowers's sentence of death and remand for a new sentencing hearing.
 

 KITCHENS, P.J., JOINS THIS OPINION. WALLER, C.J., JOINS IN PART WITH OPINION.
 

 APPENDIX
 

 DEATH CASES AFFIRMED BY THIS COURT
 

 Timothy Nelson
 

 Evans v. State
 

 ,
 
 226 So.3d 1
 
 (Miss. 2017).
 

 James Cobb Hutto III v. State
 

 ,
 
 227 So.3d 963
 
 , 2014-DP-00177-SCT,
 
 2017 WL 2001157
 
 (Miss. May 11, 2017).
 

 David Cox v. State
 

 ,
 
 183 So.3d 36
 
 (Miss. 2015).
 

 David Dickerson v. State
 

 ,
 
 175 So.3d 8
 
 (Miss. 2015).
 

 Timothy Robert
 

 Ronk v. State
 

 ,
 
 172 So.3d 1112
 
 (Miss. 2015).
 

 Curtis Giovanni
 

 Flowers v. State
 

 ,
 
 158 So.3d 1009
 
 (Miss. 2014). *following remand.
 

 Caleb
 

 Corrothers v. State
 

 ,
 
 148 So.3d 278
 
 (Miss. 2014),
 
 leave to seek PCR granted in part and denied in part
 
 (Feb. 2, 2017),
 
 rehearing denied
 
 (May 11, 2017).
 

 Jason Lee Keller v. State
 

 ,
 
 138 So.3d 817
 
 (Miss. 2014),
 
 leave to seek PCR granted in part and denied in part
 
 (May 25, 2017).
 

 Leslie Galloway III v. State
 

 ,
 
 122 So.3d 614
 
 (Miss. 2013).
 

 Bobby
 

 Batiste v. State
 

 ,
 
 121 So.3d 808
 
 (Miss. 2013),
 
 granted leave to seek PCR
 
 (Jan. 21, 2016).
 

 Roger Lee Gillett v. State
 

 ,
 
 56 So.3d 469
 
 (Miss. 2010).
 

 Moffett v. State
 

 ,
 
 49 So.3d 1073
 
 (Miss. 2010).
 

 Pitchford v. State
 

 ,
 
 45 So.3d 216
 
 (Miss. 2010).
 

 Goff v. State
 

 ,
 
 14 So.3d 625
 
 (Miss. 2009).
 

 Wilson v. State
 

 ,
 
 21 So.3d 572
 
 (Miss. 2009).
 

 Chamberlin v. State
 

 ,
 
 989 So.2d 320
 
 (Miss. 2008).
 

 Loden v. State
 

 ,
 
 971 So.2d 548
 
 (Miss. 2007).
 

 King v. State,
 

 960 So.2d 413
 
 (Miss. 2007).
 

 Bennett v. State
 

 ,
 
 933 So.2d 930
 
 (Miss. 2006).
 

 Havard v. State
 

 ,
 
 928 So.2d 771
 
 (Miss. 2006).
 

 Spicer v. State
 

 ,
 
 921 So.2d 292
 
 (Miss. 2006).
 

 Hodges v. State
 

 ,
 
 912 So.2d 730
 
 (Miss. 2005).
 

 Walker v. State
 

 ,
 
 913 So.2d 198
 
 (Miss. 2005).
 

 Le v. State
 

 ,
 
 913 So.2d 913
 
 (Miss. 2005),
 
 granted leave to seek second PCR
 
 , 2013-DR-00327-SCT (Feb. 23, 2016).
 

 Brown v. State
 

 ,
 
 890 So.2d 901
 
 (Miss. 2004).
 

 Powers v. State
 

 ,
 
 883 So.2d 20
 
 (Miss. 2004)
 

 Branch v. State
 

 ,
 
 882 So.2d 36
 
 (Miss. 2004).
 

 Scott v. State
 

 ,
 
 878 So.2d 933
 
 (Miss. 2004).
 

 Lynch v. State
 

 ,
 
 877 So.2d 1254
 
 (Miss. 2004).
 

 Dycus v. State
 

 ,
 
 875 So.2d 140
 
 (Miss. 2004).
 

 Byrom v. State
 

 ,
 
 863 So.2d 836
 
 (Miss. 2003).
 

 Howell v. State
 

 ,
 
 860 So.2d 704
 
 (Miss. 2003).
 

 Howard v. State
 

 ,
 
 853 So.2d 781
 
 (Miss. 2003).
 

 Walker v. State
 

 ,
 
 815 So.2d 1209
 
 (Miss. 2002). *following remand.
 

 Bishop v. State
 

 ,
 
 812 So.2d 934
 
 (Miss. 2002).
 

 Stevens v. State
 

 ,
 
 806 So.2d 1031
 
 (Miss. 2002).
 

 Grayson v. State
 

 ,
 
 806 So.2d 241
 
 (Miss. 2002).
 

 Knox v. State
 

 ,
 
 805 So.2d 527
 
 (Miss. 2002).
 

 Simmons v. State
 

 ,
 
 805 So.2d 452
 
 (Miss. 2002).
 

 Berry v. State
 

 ,
 
 802 So.2d 1033
 
 (Miss. 2001).
 

 Snow v. State
 

 ,
 
 800 So.2d 472
 
 (Miss. 2001).
 

 Mitchell v. State
 

 ,
 
 792 So.2d 192
 
 (Miss. 2001).
 

 Puckett v. State
 

 ,
 
 788 So.2d 752
 
 (Miss. 2001). * following remand.
 

 Goodin v. State
 

 ,
 
 787 So.2d 639
 
 (Miss. 2001).
 

 Jordan v. State
 

 ,
 
 786 So.2d 987
 
 (Miss. 2001).
 

 Manning v. State
 

 ,
 
 765 So.2d 516
 
 (Miss. 2000). *following remand.
 

 Eskridge v. State
 

 ,
 
 765 So.2d 508
 
 (Miss. 2000).
 

 McGilberry v. State
 

 ,
 
 741 So.2d 894
 
 (Miss. 1999)
 

 .
 

 Puckett v. State
 

 ,
 
 737 So.2d 322
 
 (Miss. 1999). *remanded for
 
 Batson
 
 hearing.
 

 Manning v. State
 

 ,
 
 735 So.2d 323
 
 (Miss. 1999). *remanded for
 
 Batson
 
 hearing.
 

 Hughes v. State
 

 ,
 
 735 So.2d 238
 
 (Miss. 1999).
 

 Turner v. State
 

 ,
 
 732 So.2d 937
 
 (Miss. 1999).
 

 Smith v. State
 

 ,
 
 729 So.2d 1191
 
 (Miss. 1998).
 

 Burns v. State
 

 ,
 
 729 So.2d 203
 
 (Miss. 1998).
 

 Jordan v. State
 

 ,
 
 728 So.2d 1088
 
 (Miss. 1998).
 

 Gray v. State
 

 ,
 
 728 So.2d 36
 
 (Miss. 1998).
 

 Manning v. State
 

 ,
 
 726 So.2d 1152
 
 (Miss. 1998).
 

 Woodward v. State
 

 ,
 
 726 So.2d 524
 
 (Miss. 1997).
 

 Bell v. State
 

 ,
 
 725 So.2d 836
 
 (Miss. 1998),
 
 post-conviction relief granted in part and denied in part
 
 ,
 
 725 So.2d 836
 
 (Miss. 1998).
 

 Evans v. State
 

 ,
 
 725 So.2d 613
 
 (Miss. 1997).
 

 Brewer v. State
 

 ,
 
 725 So.2d 106
 
 (Miss. 1998).
 

 Crawford v. State
 

 ,
 
 716 So.2d 1028
 
 (Miss. 1998).
 

 Doss v. State
 

 ,
 
 709 So.2d 369
 
 (Miss. 1996).
 

 Underwood v. State
 

 ,
 
 708 So.2d 18
 
 (Miss. 1998).
 

 Holland v. State
 

 ,
 
 705 So.2d 307
 
 (Miss. 1997).
 

 Wells v. State
 

 ,
 
 698 So.2d 497
 
 (Miss. 1997).
 

 Wilcher v. State
 

 ,
 
 697 So.2d 1087
 
 (Miss. 1997).
 

 Wiley v. State
 

 ,
 
 691 So.2d 959
 
 (Miss. 1997).
 

 Brown v. State
 

 ,
 
 690 So.2d 276
 
 (Miss. 1996).
 

 Simon v. State
 

 ,
 
 688 So.2d 791
 
 (Miss.1997).
 

 Jackson v. State
 

 ,
 
 684 So.2d 1213
 
 (Miss. 1996).
 

 Williams v. State
 

 ,
 
 684 So.2d 1179
 
 (Miss. 1996).
 

 Davis v. State
 

 ,
 
 684 So.2d 643
 
 (Miss. 1996).
 

 Taylor v. State
 

 ,
 
 682 So.2d 359
 
 (Miss. 1996).
 

 Brown v. State
 

 ,
 
 682 So.2d 340
 
 (Miss. 1996).
 

 Blue v. State
 

 ,
 
 674 So.2d 1184
 
 (Miss. 1996).
 

 Holly v. State
 

 ,
 
 671 So.2d 32
 
 (Miss. 1996).
 

 Walker v. State
 

 ,
 
 671 So.2d 581
 
 (Miss. 1995).
 

 Russell v. State
 

 ,
 
 670 So.2d 816
 
 (Miss. 1995).
 

 Ballenger v. State
 

 ,
 
 667 So.2d 1242
 
 (Miss. 1995).
 

 Davis v. State
 

 ,
 
 660 So.2d 1228
 
 (Miss. 1995).
 

 Carr v. State
 

 ,
 
 655 So.2d 824
 
 (Miss. 1995).
 

 Mack v. State
 

 ,
 
 650 So.2d 1289
 
 (Miss. 1994).
 

 Chase v. State
 

 ,
 
 645 So.2d 829
 
 (Miss. 1994).
 

 Foster v. State
 

 ,
 
 639 So.2d 1263
 
 (Miss. 1994).
 

 Conner v. State
 

 ,
 
 632 So.2d 1239
 
 (Miss. 1993).
 

 Hansen v. State
 

 ,
 
 592 So.2d 114
 
 (Miss. 1991).
 

 *
 

 Shell v. State
 

 ,
 
 554 So.2d 887
 
 (Miss. 1989) ;
 

 Shell v. Mississippi
 
 ,
 

 498 U.S. 1
 
 ,
 
 111 S.Ct. 313
 
 ,
 
 112 L.Ed.2d 1
 
 (1990) reversing, in part, and remanding;
 

 Shell v. State
 

 ,
 
 595 So.2d 1323
 
 (Miss. 1992) remanding for new sentencing hearing.
 

 Davis v. State
 

 ,
 
 551 So.2d 165
 
 (Miss. 1989).
 

 Minnick v. State
 

 ,
 
 551 So.2d 77
 
 (Miss. 1989).
 

 *
 

 Pinkney v. State
 

 ,
 
 538 So.2d 329
 
 (Miss. 1989) ;
 

 Pinkney v. Mississippi
 

 ,
 
 494 U.S. 1075
 
 ,
 
 110 S.Ct. 1800
 
 ,
 
 108 L.Ed.2d 931
 
 (1990) vacating and remanding;
 

 Pinkney v. State
 

 ,
 
 602 So.2d 1177
 
 (Miss. 1992) remanding for new sentencing hearing.
 

 *
 

 Clemons v. State
 

 ,
 
 535 So.2d 1354
 
 (Miss. 1988) ;
 

 Clemons v. Mississippi
 

 ,
 
 494 U.S. 738
 
 ,
 
 110 S.Ct. 1441
 
 ,
 
 108 L.Ed.2d 725
 
 (1990) vacating and remanding;
 

 Clemons v. State
 

 ,
 
 593 So.2d 1004
 
 (Miss. 1992) remanding for new sentencing hearing.
 

 Woodward v. State
 

 ,
 
 533 So.2d 418
 
 (Miss. 1988).
 

 Nixon v. State
 

 ,
 
 533 So.2d 1078
 
 (Miss. 1987).
 

 Cole v. State
 

 ,
 
 525 So.2d 365
 
 (Miss. 1987).
 

 Lockett v. State
 

 ,
 
 517 So.2d 1346
 
 (Miss. 1987).
 

 Lockett v. State
 

 ,
 
 517 So.2d 1317
 
 (Miss. 1987).
 

 Faraga v. State
 

 ,
 
 514 So.2d 295
 
 (Miss. 1987).
 

 *
 

 Jones v. State
 

 ,
 
 517 So.2d 1295
 
 (Miss. 1987) ;
 

 Jones v. Mississippi
 

 ,
 
 487 U.S. 1230
 
 ,
 
 108 S.Ct. 2891
 
 ,
 
 101 L.Ed.2d 925
 
 (1988) vacating and remanding;
 

 Jones v. State
 

 ,
 
 602 So.2d 1170
 
 (Miss. 1992) remanding for new sentencing hearing.
 

 Wiley v. State
 

 ,
 
 484 So.2d 339
 
 (Miss. 1986).
 

 Johnson v. State
 

 ,
 
 477 So.2d 196
 
 (Miss. 1985).
 

 Gray v. State
 

 ,
 
 472 So.2d 409
 
 (Miss. 1985).
 

 Cabello v. State
 

 ,
 
 471 So.2d 332
 
 (Miss. 1985).
 

 Jordan v. State
 

 ,
 
 464 So.2d 475
 
 (Miss. 1985).
 

 Wilcher v. State
 

 ,
 
 455 So.2d 727
 
 (Miss. 1984).
 

 Billiot v. State
 

 ,
 
 454 So.2d 445
 
 (Miss. 1984).
 

 Stringer v. State
 

 ,
 
 454 So.2d 468
 
 (Miss. 1984).
 

 Dufour v. State
 

 ,
 
 453 So.2d 337
 
 (Miss. 1984).
 

 Neal v. State
 

 ,
 
 451 So.2d 743
 
 (Miss. 1984).
 

 Booker v. State
 

 ,
 
 449 So.2d 209
 
 (Miss. 1984).
 

 Wilcher v. State
 

 ,
 
 448 So.2d 927
 
 (Miss. 1984).
 

 Caldwell v. State
 

 ,
 
 443 So.2d 806
 
 (Miss. 1983).
 

 Irving v. State
 

 ,
 
 441 So.2d 846
 
 (Miss. 1983).
 

 Tokman v. State
 

 ,
 
 435 So.2d 664
 
 (Miss. 1983).
 

 Leatherwood v. State
 

 ,
 
 435 So.2d 645
 
 (Miss. 1983).
 

 Hill v. State
 

 ,
 
 432 So.2d 427
 
 (Miss. 1983).
 

 Pruett v. State
 

 ,
 
 431 So.2d 1101
 
 (Miss. 1983).
 

 Gilliard v. State
 

 ,
 
 428 So.2d 576
 
 (Miss. 1983).
 

 Evans v. State
 

 ,
 
 422 So.2d 737
 
 (Miss. 1982).
 

 King v. State
 

 ,
 
 421 So.2d 1009
 
 (Miss. 1982).
 

 Wheat v. State
 

 ,
 
 420 So.2d 229
 
 (Miss. 1982).
 

 Smith v. State
 

 ,
 
 419 So.2d 563
 
 (Miss. 1982).
 

 Johnson v. State
 

 ,
 
 416 So.2d 383
 
 (Miss.1982).
 

 Edwards v. State
 

 ,
 
 413 So.2d 1007
 
 (Miss. 1982).
 

 Bullock v. State
 

 ,
 
 391 So.2d 601
 
 (Miss. 1980).
 

 Reddix v. State
 

 ,
 
 381 So.2d 999
 
 (Miss. 1980).
 

 Jones v. State
 

 ,
 
 381 So.2d 983
 
 (Miss. 1980).
 

 Culberson v. State
 

 ,
 
 379 So.2d 499
 
 (Miss. 1979).
 

 Gray v. State
 

 ,
 
 375 So.2d 994
 
 (Miss. 1979).
 

 Jordan v. State
 

 ,
 
 365 So.2d 1198
 
 (Miss. 1978).
 

 Voyles v. State
 

 ,
 
 362 So.2d 1236
 
 (Miss. 1978).
 

 Irving v. State
 

 ,
 
 361 So.2d 1360
 
 (Miss. 1978).
 

 Washington v. State
 

 ,
 
 361 So.2d 61
 
 (Miss. 1978).
 

 Bell v. State
 

 ,
 
 360 So.2d 1206
 
 (Miss. 1978).
 

 DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCING PHASE
 

 Sherwood Brown v. State
 

 , 2017-DR-00206=SCT (Oct. 26, 2017) (order).
 

 Erik Wayne
 

 Hollie v. State
 

 ,
 
 174 So.3d 824
 
 (Miss. 2015).
 

 Manning v. State
 

 ,
 
 158 So.3d 302
 
 (Miss. 2015) (reversing denial of post-conviction relief).
 

 Byrom v. State
 

 , 2014-DR-00230-SCT (April 3, 2014) (order).
 

 Ross v. State
 

 ,
 
 954 So.2d 968
 
 (Miss. 2007).
 

 Flowers v. State
 

 ,
 
 947 So.2d 910
 
 (Miss. 2007).
 

 Flowers v. State
 

 ,
 
 842 So.2d 531
 
 (Miss. 2003).
 

 Randall v. State
 

 ,
 
 806 So.2d 185
 
 (Miss. 2002).
 

 Flowers v. State
 

 ,
 
 773 So.2d 309
 
 (Miss. 2000).
 

 Edwards v. State
 

 ,
 
 737 So.2d 275
 
 (Miss. 1999).
 

 Smith v. State
 

 ,
 
 733 So.2d 793
 
 (Miss. 1999).
 

 Porter v. State
 

 ,
 
 732 So.2d 899
 
 (Miss. 1999).
 

 Kolberg v. State
 

 ,
 
 704 So.2d 1307
 
 (Miss. 1997).
 

 Snelson v. State
 

 ,
 
 704 So.2d 452
 
 (Miss. 1997).
 

 Fus
 

 e
 

 lier v. State
 

 ,
 
 702 So.2d 388
 
 (Miss. 1997).
 

 Howard v. State
 

 ,
 
 701 So.2d 274
 
 (Miss. 1997).
 

 Lester v. State
 

 ,
 
 692 So.2d 755
 
 (Miss. 1997).
 

 Hunter v. State
 

 ,
 
 684 So.2d 625
 
 (Miss. 1996).
 

 Lanier v. State
 

 ,
 
 684 So.2d 93
 
 (Miss. 1996).
 

 Giles v. State
 

 ,
 
 650 So.2d 846
 
 (Miss. 1995).
 

 Duplantis v. State
 

 ,
 
 644 So.2d 1235
 
 (Miss. 1994).
 

 Harrison v. State
 

 ,
 
 635 So.2d 894
 
 (Miss. 1994).
 

 Butler v. State
 

 ,
 
 608 So.2d 314
 
 (Miss. 1992).
 

 Jenkins v. State
 

 ,
 
 607 So.2d 1171
 
 (Miss. 1992).
 

 Abram v. State
 

 ,
 
 606 So.2d 1015
 
 (Miss. 1992).
 

 Balfour v. State
 

 ,
 
 598 So.2d 731
 
 (Miss. 1992).
 

 Griffin v. State
 

 ,
 
 557 So.2d 542
 
 (Miss. 1990).
 

 Bevill v. State
 

 ,
 
 556 So.2d 699
 
 (Miss. 1990).
 

 West v. State
 

 ,
 
 553 So.2d 8
 
 (Miss. 1989).
 

 Leatherwood v. State
 

 ,
 
 548 So.2d 389
 
 (Miss. 1989).
 

 Mease v. State
 

 ,
 
 539 So.2d 1324
 
 (Miss. 1989).
 

 Houston v. State
 

 ,
 
 531 So.2d 598
 
 (Miss. 1988).
 

 West v. State
 

 ,
 
 519 So.2d 418
 
 (Miss. 1988).
 

 Davis v. State
 

 ,
 
 512 So.2d 1291
 
 (Miss. 1987).
 

 Williamson v. State
 

 ,
 
 512 So.2d 868
 
 (Miss. 1987).
 

 Foster v. State
 

 ,
 
 508 So.2d 1111
 
 (Miss. 1987).
 

 Smith v. State
 

 ,
 
 499 So.2d 750
 
 (Miss. 1986).
 

 West v. State
 

 ,
 
 485 So.2d 681
 
 (Miss. 1985).
 

 Fisher v. State
 

 ,
 
 481 So.2d 203
 
 (Miss. 1985).
 

 Johnson v. State
 

 ,
 
 476 So.2d 1195
 
 (Miss. 1985).
 

 Fuselier v. State
 

 ,
 
 468 So.2d 45
 
 (Miss. 1985).
 

 West v. State
 

 ,
 
 463 So.2d 1048
 
 (Miss. 1985).
 

 Jones v. State
 

 ,
 
 461 So.2d 686
 
 (Miss. 1984).
 

 Moffett v. State
 

 ,
 
 456 So.2d 714
 
 (Miss. 1984).
 

 Lanier v. State
 

 ,
 
 450 So.2d 69
 
 (Miss. 1984).
 

 Laney v. State
 

 ,
 
 421 So.2d 1216
 
 (Miss. 1982).
 

 DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT
 

 Bell v. State
 

 ,
 
 160 So.3d 188
 
 (Miss. 2015).
 

 Reddix v. State
 

 ,
 
 547 So.2d 792
 
 (Miss. 1989).
 

 Wheeler v. State
 

 ,
 
 536 So.2d 1341
 
 (Miss. 1988).
 

 White v. State
 

 ,
 
 532 So.2d 1207
 
 (Miss. 1988).
 

 Bullock v. State
 

 ,
 
 525 So.2d 764
 
 (Miss. 1987).
 

 Edwards v. State
 

 ,
 
 441 So.2d 84
 
 (Miss. 1983).
 

 Dycus v. State
 

 ,
 
 440 So.2d 246
 
 (Miss. 1983).
 

 Coleman v. State
 

 ,
 
 378 So.2d 640
 
 (Miss. 1979).
 

 DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY
 

 Fulgham v. State
 

 ,
 
 46 So.3d 315
 
 (Miss. 2010).
 

 Rubenstein v. State
 

 ,
 
 941 So.2d 735
 
 (Miss. 2006).
 

 King v. State
 

 ,
 
 784 So.2d 884
 
 (Miss. 2001).
 

 Walker v. State
 

 ,
 
 740 So.2d 873
 
 (Miss. 1999).
 

 Watts v. State
 

 ,
 
 733 So.2d 214
 
 (Miss. 1999).
 

 West v. State
 

 ,
 
 725 So.2d 872
 
 (Miss. 1998).
 

 Smith v. State
 

 ,
 
 724 So.2d 280
 
 (Miss. 1998).
 

 Berry v. State
 

 ,
 
 703 So.2d 269
 
 (Miss. 1997).
 

 Booker v. State
 

 ,
 
 699 So.2d 132
 
 (Miss. 1997).
 

 Taylor v. State
 

 ,
 
 672 So.2d 1246
 
 (Miss. 1996).
 

 *
 

 Shell v. State
 

 ,
 
 554 So.2d 887
 
 (Miss. 1989) ;
 

 Shell v. Mississippi
 

 ,
 
 498 U.S. 1
 
 ,
 
 111 S.Ct. 313
 
 ,
 
 112 L.Ed.2d 1
 
 (1990) reversing, in part, and remanding;
 

 Shell v. State
 

 ,
 
 595 So.2d 1323
 
 (Miss. 1992) remanding for new sentencing hearing.
 

 *
 

 Pinkney v. State
 

 ,
 
 538 So.2d 329
 
 (Miss. 1989) ;
 

 Pinkney v. Mississippi,
 

 494 U.S. 1075
 
 ,
 
 110 S.Ct. 1800
 
 ,
 
 108 L.Ed.2d 931
 
 (1990) vacating and remanding;
 

 Pinkney v. State
 
 ,
 

 602 So.2d 1177
 
 (Miss. 1992) remanding for new sentencing hearing.
 

 *
 

 Clemons v. State
 

 ,
 
 535 So.2d 1354
 
 (Miss. 1988) ;
 

 Clemons v. Mississippi
 

 ,
 
 494 U.S. 738
 
 ,
 
 110 S.Ct. 1441
 
 ,
 
 108 L.Ed.2d 725
 
 (1990) vacating and remanding;
 

 Clemons v. State
 

 ,
 
 593 So.2d 1004
 
 (Miss. 1992) remanding for new sentencing hearing.
 

 *
 

 Jones v. State
 

 ,
 
 517 So.2d 1295
 
 (Miss. 1987) ;
 

 Jones v. Mississippi
 
 ,
 

 487 U.S. 1230
 
 ,
 
 108 S.Ct. 2891
 
 ,
 
 101 L.Ed.2d 925
 
 (1988) vacating and remanding;
 

 Jones v. State
 

 ,
 
 602 So.2d 1170
 
 (Miss. 1992) remanding for new sentencing hearing.
 

 Russell v. State
 

 ,
 
 607 So.2d 1107
 
 (Miss. 1992).
 

 Holland v. State
 

 ,
 
 587 So.2d 848
 
 (Miss. 1991).
 

 Willie v. State
 

 ,
 
 585 So.2d 660
 
 (Miss. 1991).
 

 Ladner v. State
 

 ,
 
 584 So.2d 743
 
 (Miss. 1991).
 

 Mackbee v. State
 

 ,
 
 575 So.2d 16
 
 (Miss. 1990).
 

 Berry v. State
 

 ,
 
 575 So.2d 1
 
 (Miss. 1990).
 

 Turner v. State
 

 ,
 
 573 So.2d 657
 
 (Miss. 1990).
 

 State v. Tokman
 

 ,
 
 564 So.2d 1339
 
 (Miss. 1990).
 

 Johnson v. State
 

 ,
 
 547 So.2d 59
 
 (Miss. 1989).
 

 Williams v. State
 

 ,
 
 544 So.2d 782
 
 (Miss. 1989) ;
 
 sentence aff'd,
 

 684 So.2d 1179
 
 (1996).
 

 Lanier v. State
 

 ,
 
 533 So.2d 473
 
 (Miss. 1988).
 

 Stringer v. State
 

 ,
 
 500 So.2d 928
 
 (Miss. 1986).
 

 Pinkton v. State
 

 ,
 
 481 So.2d 306
 
 (Miss. 1985).
 

 Mhoon v. State
 

 ,
 
 464 So.2d 77
 
 (Miss. 1985).
 

 Cannaday v. State
 

 ,
 
 455 So.2d 713
 
 (Miss. 1984).
 

 Wiley v. State
 

 ,
 
 449 So.2d 756
 
 (Miss. 1984) ; resentencing affirmed,
 

 Wiley v. State
 

 ,
 
 484 So.2d 339
 
 (Miss. 1986) ;
 
 cert. denied,
 

 Wiley v. Mississippi
 

 ,
 
 486 U.S. 1036
 
 ,
 
 108 S.Ct. 2024
 
 ,
 
 100 L.Ed.2d 610
 
 (1988) ; resentencing ordered,
 

 Wiley v. State
 
 ,
 

 635 So.2d 802
 
 (Miss. 1993) following writ of habeas corpus issued pursuant to
 

 Wiley v. Puckett
 

 ,
 
 969 F.2d 86
 
 , 105-106 (5th Cir. 1992) ; resentencing affirmed.
 

 Williams v. State
 

 ,
 
 445 So.2d 798
 
 (Miss. 1984). *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.
 

 (Revised October 30, 2017.)
 

 Batson v. Kentucky
 
 ,
 
 476 U.S. 79
 
 , 89,
 
 106 S.Ct. 1712
 
 ,
 
 90 L.Ed.2d 69
 
 (1986).
 

 The record does not indicate whether Cunningham was nodding in the affirmative or the negative.
 

 Daubert v. Merrell Dow Pharms., Inc.
 
 ,
 
 509 U.S. 579
 
 ,
 
 113 S.Ct. 2786
 
 ,
 
 125 L.Ed.2d 469
 
 (1993).
 

 See
 

 Ex Parte Williams
 
 ,
 
 594 So.2d 1225
 
 , 1227 (Ala. 1992) ("It is clear from these cases that there is presently a trend in the law to allow expert testimony on the subject of human memory.");
 
 Skamarocius v. State
 
 ,
 
 731 P.2d 63
 
 , 66-67 (Alaska 1987) ;
 
 State v. Chapple
 
 ,
 
 135 Ariz. 281
 
 ,
 
 660 P.2d 1208
 
 , 1219 (1983),
 
 overruled on different grounds by
 

 State v. Benson
 
 ,
 
 232 Ariz. 452
 
 ,
 
 307 P.3d 19
 
 (2013) ;
 
 Jones v. State
 
 ,
 
 314 Ark. 289
 
 ,
 
 862 S.W.2d 242
 
 , 244-45 (1993) ;
 
 People v. Jones
 
 ,
 
 30 Cal.4th 1084
 
 ,
 
 135 Cal.Rptr.2d 370
 
 ,
 
 70 P.3d 359
 
 , 388 (2003) ("Exclusion of the expert testimony is justified only if there is other evidence that substantially corroborates the eyewitnesses identification and gives it independent reliability.");
 
 People v. Campbell
 
 ,
 
 847 P.2d 228
 
 , 233 (Colo. App. 1992) ;
 
 State v. Guilbert
 
 ,
 
 306 Conn. 218
 
 ,
 
 49 A.3d 705
 
 , 731-32 (2012) ;
 
 Hager v. U.S.
 
 ,
 
 856 A.2d 1143
 
 , 1147 (D.C. 2004) ;
 
 McMullen v. State
 
 ,
 
 714 So.2d 368
 
 , 371 (Fla. 1998) ;
 
 Johnson v. State
 
 ,
 
 272 Ga. 254
 
 ,
 
 526 S.E.2d 549
 
 , 552 (2000) ;
 
 People v. Enis
 
 ,
 
 139 Ill.2d 264
 
 ,
 
 151 Ill.Dec. 493
 
 ,
 
 564 N.E.2d 1155
 
 , 1165 (1990) ;
 
 Cook v. State
 
 ,
 
 734 N.E.2d 563
 
 , 570 (Ind. 2000) ;
 
 State v. Schutz
 
 ,
 
 579 N.W.2d 317
 
 , 319 (Iowa 1998) ("[T]he admissibility of expert testimony relating to the accuracy of eye witness identification rests within the sound discretion of the trial court.");
 
 State v. Carr
 
 ,
 
 300 Kan. 1
 
 ,
 
 331 P.3d 544
 
 , 690 (2014),
 
 overruled on other grounds by
 

 Kansas v. Carr
 
 , --- U.S. ----,
 
 136 S.Ct. 633
 
 ,
 
 193 L.Ed.2d 535
 
 (2016) ;
 
 Commonwealth v. Christie
 
 ,
 
 98 S.W.3d 485
 
 , 488 (Ky. 2002) (noting that the vast majority of jurisdictions have left the admission of eyewitness expert identification testimony to the discretion of trial courts);
 
 State v. Rich
 
 ,
 
 549 A.2d 742
 
 , 743 (Me. 1988) ;
 
 Bomas v. State
 
 ,
 
 412 Md. 392
 
 ,
 
 987 A.2d 98
 
 , 114-115 (2010) ;
 
 Commonwealth v. Santoli
 
 ,
 
 424 Mass. 837
 
 ,
 
 680 N.E.2d 1116
 
 , 1120 (1997) ;
 
 State v. Barlow
 
 ,
 
 541 N.W.2d 309
 
 , 313 (Minn. 1995) ;
 
 State v. DuBray
 
 ,
 
 317 Mont. 377
 
 ,
 
 77 P.3d 247
 
 , 255 (2003) ("It shall be an abuse of discretion for a district court to disallow expert testimony on eyewitness testimony when no substantial corroborating evidence exists.");
 
 White v. State
 
 ,
 
 112 Nev. 1261
 
 ,
 
 926 P.2d 291
 
 , 292 (1996) ;
 
 State v. Henderson
 
 ,
 
 208 N.J. 208
 
 ,
 
 27 A.3d 872
 
 , 916-17 (2011) ;
 
 People v. LeGrand
 
 ,
 
 8 N.Y.3d 449
 
 ,
 
 835 N.Y.S.2d 523
 
 ,
 
 867 N.E.2d 374
 
 , 379 (2007) ;
 
 State v. Fontaine
 
 ,
 
 382 N.W.2d 374
 
 , 378 (N.D. 1986) ;
 
 State v. Buell
 
 ,
 
 22 Ohio St.3d 124
 
 ,
 
 489 N.E.2d 795
 
 , 803 (1986) ;
 
 Bristol v. State
 
 ,
 
 764 P.2d 887
 
 , 890 (Okla. Crim. App. 1988) ;
 
 State v. Lawson
 
 ,
 
 352 Or. 724
 
 ,
 
 291 P.3d 673
 
 , 697 (2012) ;
 
 Commonwealth v. Walker
 
 ,
 
 625 Pa. 450
 
 ,
 
 92 A.3d 766
 
 , 791 (2014) ("[I]n light of the magnitude of scientific understanding of eyewitness identification and marked developments in case law during the last 30 years, it is no longer advisable to ban the use of expert testimony to aid a jury in understanding eyewitness identification.");
 
 State v. Sabetta
 
 ,
 
 680 A.2d 927
 
 , 933 (R.I. 1996) ;
 
 State v. Whaley
 
 ,
 
 305 S.C. 138
 
 ,
 
 406 S.E.2d 369
 
 , 372 (1991) ;
 
 State v. Hill
 
 ,
 
 463 N.W.2d 674
 
 , 676 (S.D. 1990) ;
 
 Jordan v. State
 
 ,
 
 928 S.W.2d 550
 
 , 555 (Tex. Crim. App. 1996) ;
 
 State v. Clopten
 
 ,
 
 223 P.3d 1103
 
 , 1112 (Utah 2009) ;
 
 State v. Percy
 
 ,
 
 156 Vt. 468
 
 ,
 
 595 A.2d 248
 
 , 253 (1990) ;
 
 State v. Cheatam
 
 ,
 
 150 Wash.2d 626
 
 ,
 
 81 P.3d 830
 
 , 842 (2003) ;
 
 State v. Utter
 
 , No. 13-0479,
 
 2014 WL 1673025
 
 , at *3 (W. Va. Apr. 25, 2014) ;
 
 State v. Shomberg
 
 ,
 
 288 Wis.2d 1
 
 ,
 
 709 N.W.2d 370
 
 , 377 (2006) ;
 
 Engberg v. Meyer
 
 ,
 
 820 P.2d 70
 
 , 79-80 (Wyo. 1991).
 

 Dr. Neuschatz cited studies by: (1) Neisser 1967; (2) Loftus 1979; (3) Loftus & Loftus 1990; (4) Schacter 1995; (5) Ellis, Davis & Shepard 1977; (6) Maclin, Maclin & Malpass 2001; (7) Shapiro & Penrod 1986; (8) Memon, Hope & Bull 2003; (9) Culter & Penrod 1988; (10) Culter, Penrod & Martens 1987 (study a); (11) Culter, Penrod & Martens 1987 (study b); (12) Culter 1986; (13) O'Rourke 1987; (14) Culter 2006; (15) Tulving 1983; (16) Hunt & Ellis 1974; (17) Read, Tollestrup, Hammersley, McFadden & Christensen 1990; (18) Ross, Ceci, Dunning & Toglia 1994; (19) Meissner & Brigham 2001; (20) Gibson 1969; (21) Wells & Bradfield 1998; (22) Neuschatz 2005; (23) Hafstad, Memon & Logie 2004; (24) Wells, Small, Penrod, Malpass, Fulero & Brimacombe 1998; (25) Haw & Fisher 2004; (26) Garrioch & Brimacombe 2001; (27) Neuschatz & Gutler (in progress); (28) Douglas, Smith, & Frasier-Hill 2005; (29) Malpass & Devine 1981; (30) Stebaly 1997; (31) Loftus 1993; (32) Johnson 1993; and (33) Pezdek 2007.
 

 It is difficult to imagine the Majority rejecting out-of-hand the opinions of the State's pathologist as to the cause and manner of death, simply because the record does not include all of the underlying studies and data that contributed to that opinion.
 

 Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.